## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JAMARSAE WATKINS** | ) | |
| | ) | |
| *Plaintiff,* | ) | **CIVIL ACTION NO**. |
| | ) | |
| v. | ) | |
| | ) | |
| **EXXON MOBIL CORPORATION** | ) | |
| | ) | |
| *Defendant.* | ) | <u>**JURY TRIAL DEMANDED**</u> |

### <u>COMPLAINT</u>

**NOW INTO COURT**, Plaintiff Jamarsae Watkins ("Mr. Watkins"), by and through

undersigned counsel, hereby submits his Complaint against Exxon Mobil Corporation

("Defendant" or "Exxon") and alleges the following:

### <u>INTRODUCTION</u>

1.

Plaintiff Jamarsae Watkins, by and through his attorney, bring this action against Exxon

for violations of the Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights

Act of 1991, violations of 42 U.S.C. § 2000e et seq., violations of 42 U.S.C. § 12101 et seq.

("Americans with Disabilities Act of 1990" or "ADA"), as amended by the  and violations of

42 U.S.C. § 1981 et seq. ("Title VII").

### <u>JURISDICTION AND VENUE</u>

2.

This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, which confers

original jurisdiction upon this Court for actions arising under the laws of the United States, and

1

pursuant to 28 U.S.C. § 1343(3) and 1343(4), which confers original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief under (i) under any Act of Congress providing for the protection of civil rights; and (ii) Title VII. This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1367, which confers supplemental jurisdiction upon this Court for all other claims that are so related to claims in the action within original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3.

Defendant is an "employer" engaged in an industry affecting commerce as defined by 42 U.S.C. § 2000e(b).

4.

This court has personal jurisdiction over Exxon. Defendant Exxon is a for-profit corporation doing business in Louisiana. At all times relevant, Exxon operated its business within the State of Louisiana.

5.

Defendant operates its business within the Middle District of Louisiana. All actions and inactions by Defendants alleged occurred within the Middle District of Louisiana. Venue in this district is proper for the Defendant pursuant to 28 U.S.C. §1391(b) & (c).

## PARTIES

6.

Plaintiff Jamarsae Watkins is an African American male with a spinal injury and cardiomegaly. At all relevant times, Mr. Watkins has been a resident of the State of Louisiana and met the definition of an "employee" under all applicable statutes. He is a qualified individual with disabilities under the ADA.

7.

Upon information and belief, Exxon Mobil Corporation is a for-profit business engaged in providing energy and chemical resources to power businesses, construction, and support manufacturing. At all relevant times, Exxon has met the definition of an "employer" under all applicable statutes.

## FACTS

8.

Exxon is a privately owned industrial company that provides energy and chemical resources worldwide and employs about 61,000 individuals across the United States, including Louisiana.

9.

The Defendant, Exxon, operates at the Baton Rouge Plant located at 4045 Scenic Highway, Baton Rouge, LA 70805.

10.

On or about July 9, 2012, Plaintiff started his employment with Exxon as an OXO Assistant Operator in a four-year apprenticeship. As an Assistant Operator his key duties included learning primary unit operations, safety limits, and control schemes. Plaintiff was required to have a working knowledge of process/environmental hazards and safeguards, ensuring compliance with safe work standards, management of change, and written procedures. This included conducting sampling rounds with a process and safety mindset, developing process plans for equipment preparation, focusing on improving unit operations and equipment monitoring, and participating in emergency response activities.

11.

3

Plaintiff has consistently been a top performer. As an Assistant Operator, he routinely arrived an hour before his 5:30 am shifts to study training materials. His supervisors soon took notice.

12.

On or about July 2012, First Line Supervisor Graville Townsel (African American) told Plaintiff that he was ranked as the second-best performer in his hiring class.

13.

On or about November 2012, First Line Supervisors Jason McClanahan and Chip Leger commented that Plaintiff must have a lantern in his car since he arrived so early to study. Mr. Leger, Mr. McClanahan, and First Line Supervisor Allen Pourciau later noted that they were highly impressed with Plaintiff's performance as a trainee.

14.

Plaintiff performed his job duties in an exemplary manner. He was promoted to Operations Controller Supervisor in 2016 after completing a four-year apprenticeship, despite having no prior plant experience.

15.

From the beginning of his employment and throughout his tenure, Plaintiff was subjected to persistent racial discrimination, harassment, retaliation, and later disability-based discrimination by supervisors and coworkers at the Exxon Mobil Baton Rouge Plant.

16.

In support of Mr. Watkins's allegation of hostile work environment under Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e et seq. and  Mr. Watkins further alleges:

4

17.

Mr. Watkins, an African American male with a spinal injury and cardiomegaly, is a member of a protected class under Title VII of the Civil Rights Act of 1964. Throughout his employment with Exxon, he was subjected to a hostile and discriminatory work environment that was severe, pervasive, and grounded in racial animus.

18.

In December 2012, Trainer Greg Campagna made racially charged statements suggesting that black people are lazy, unemployed, and prefer to "chill in the hood and drink their 40s."

19.

In Fall 2013, Leger mocked Mr. Watkins's interaction with African American contractors by insinuating a connection to prisoners: "You seem to be real fond of prisoners huh Jamarsae?"

20.

In Summer 2016, in Mr. Watkins's presence, Caucasian employee Jeff Hebert stated, "What's the matter Kasey, you not hanging with the N*ggers today?" Another African American employee confirmed that Hebert used similar hate speech on multiple occasions.

21.

In Fall 2017, Hebert made another racist comment in response to a contractor confusing Plaintiff and another Black employee, saying, "Don't worry about it man, they all look alike."

22.

During the 2020 George Floyd protests, supervisors Darian Wesson and Andrew McCain posted violent, racist Facebook messages. Wesson's post advocated for lynching Black individuals, stating "All the Rope in Texas, Find a Tall Oak Tree" and "They should be hung high in the street." Despite the violent rhetoric, Exxon took no disciplinary action, and both men were instead

promoted subsequently.

23.

After Mr. Watkins and others reported these posts, Exxon management, including Second Line Supervisor Francis Jackson, held a meeting with six African American employees, offering them promotions or overtime in exchange for silence. Mr. Watkins refused and was subsequently targeted.

24.

From 2019 to 2023, Mr. Watkins documented over 30 instances where white employees committed safety violations, slept on duty, or improperly used cell phones. These employees received no discipline, while Mr. Watkins and other Black employees were reprimanded or demoted for minor or fabricated infractions.

25.

Between October and November 2021, Mr. Watkins was subjected to multiple drug tests under the guise of randomness. However, a medical technician disclosed that the tests were directed specifically by Supervisor Lemoine. Bridget Reed confirmed that Lemoine targeted Mr. Watkins in hopes of finding a pretext to terminate him and noted that Lemoine had posted on Facebook that Black employees should be drug tested.

26.

Although Mr. Watkins was consistently recognized as one of the highest-performing employees, ranked second-best out of 30 in 2019 and described as "the smartest man in the unit" in 2023, he was denied multiple promotions. These positions were instead awarded to less-qualified white employees, some of whom had serious disciplinary histories or had nearly been terminated. Despite being promised training opportunities and being next in line for promotion,

Mr. Watkins was bypassed repeatedly in favor of his white peers.

27.

Mr. Watkins raised concerns about racial discrimination and unequal treatment to various supervisors, including Department Head Andrew Rykowski and Supervisor Natasha Alvillar. His reports were routinely disregarded, and no remedial action was taken. In December 2021, he submitted leadership feedback stating that Lemoine made disciplinary decisions based on race, this too was ignored.

28.

On June 6, 2022, Plaintiff suffered a serious spinal injury after being rear-ended at a red light. As a result, he was diagnosed with cervical and lumbar disc herniations, requiring ongoing medical treatment, including injections and ultimately corrective surgery. Despite these limitations, Plaintiff remained capable of performing his job, which did not involve manual labor.

29.

On or about September 9, 2022, Richard Lemoine, a decision-maker and supervisor, admitted to another employee, Kevin Taylor Jr., that he was "biased," "grew up biased," and that "bias was in his work." Lemoine further acknowledged that although he valued Plaintiff's skills and expertise, he had a preference for promoting Caucasian employees. Despite this clear admission of racial bias, Exxon allowed Lemoine to continue supervising Plaintiff and other African American employees, placing them at a disadvantage in promotional decisions.

30.

In March 2023, Plaintiff submitted updated medical documentation to Exxon's HR department outlining limitations from his spinal injuries. His treating physician restricted him to light duty, citing reduced range of motion and an inability to lift heavy objects. Plaintiff's position

did not require physical labor, and he remained fully capable of performing his job duties effectively.

31.

In May 2023, Lemoine made a racially charged statement in Plaintiff's presence. While speaking to a Caucasian contractor, Lemoine said, "Just another day at the circus, making monkeys jump through fire," a comment soaked in racial animus that invoked deeply offensive racial imagery and was clearly directed toward African American employees under his supervision.

32.

Despite Plaintiff's qualifications and a prior recommendation for promotion to Shift Team Leader in 2019, Exxon instead promoted a white employee, Jacob Bennett, in September 2023. Bennett had a documented history of sleeping on the job and was widely regarded as a poor performer. Plaintiff was told that he lacked sufficient tenure, a justification that appears pretextual given his prior endorsement and superior performance.

33.

On November 7, 2023, Human Resources requested that Plaintiff update his workplace accommodation records. In internal communications, HR Representative Sarah Hayden, who is Caucasian, acknowledged that Exxon had the discretion to disregard Plaintiff's medical restrictions, effectively undermining the legitimacy of his documented medical condition. This discretionary approach was not evenly applied to similarly situated non-Black employees.

34.

On or about November 12, 2023, Plaintiff was observed with his cell phone on his desk during a shift where he had no active post responsibility. Per Exxon's policies, personal phone use under these circumstances warrants, at most, an oral reminder. However, Plaintiff, unlike similarly

situated Caucasian supervisors, who regularly used their phones without consequence, was demoted just days later on or about November 15, 2023, from his position in the Supervisor Program to the physically demanding role of Assistant Operator.

35.

This demotion constituted a significant change in job responsibilities and was inconsistent with Plaintiff's medical restrictions. As a result of prior spinal injuries, Plaintiff's doctor had clearly stated in his November 7, 2023, disclosure that he could not safely perform tasks such as climbing towers, operating heavy machinery, or lifting heavy objects. Despite this, Exxon reassigned Plaintiff to a role requiring those very tasks, setting the stage for foreseeable harm.

36.

On November 18, 2023, Plaintiff experienced a cardiac episode and was diagnosed with cardiomegaly. He promptly notified Exxon. Due to cardiomegaly, Plaintiff was advised that dust and chemical exposure were causing his pulmonary symptoms.

37.

On or about November 25, 2023, supervisors Mr. Lemoine and Ms. Avillar altered Plaintiff's work schedule without informing him, creating the risk of an unexcused absence, a tactic that could be used pretextually to justify termination.

38.

On November 27, 2023, Plaintiff notified five Exxon officials that he could not perform his demoted duties due to disability-related restrictions. On December 19, 2023, Plaintiff submitted an Individual Disability Report (IDR) to Exxon's Site Occupational Health Manager, Dr. Holly Chaney, confirming he was unfit for work until February 2024. Despite receiving and acknowledging the IDR, Exxon representatives continued to misrepresent and downplay

Plaintiff's medical limitations.

39.

On or about February 6, 2024, Fred R. DeFrancesch, MD, sent Exxon an additional IDR memorializing Plaintiff's disc and lumbar injuries and finding him "unfit for any type of work" until at least June 2024, pending a reassessment.

40.

Exxon's Occupational Health nurse Greg Grizzafi falsely claimed that Plaintiff's doctor's office had cleared him for limited-duty work, despite a signed IDR from Dr. Fred DeFrancesch stating that Plaintiff was "unfit for any type of work" through June 2024.

41.

Plaintiff filed a formal Charge of Discrimination with the EEOC on or about February 8, 2024, citing racial and disability discrimination as well as retaliation. Shortly thereafter, Exxon HR representatives, including Sarah Hayden, who had been involved in prior accommodation discussions launched an internal investigation aimed at undermining Plaintiff's claims, rather than addressing the underlying misconduct.

42.

In a letter dated March 19, 2024, Exxon BRCX IAS Process Department Head Cal Ebey demanded that Mr. Watkins submit yet another new IDR form memorializing his medical conditions by March 26, 2024, threatening to cease his short-term disability benefits and subject him to discipline, "including termination."

43.

In response, Mr. Watkins submitted an additional pulmonary IDR on March 25, 2024, in which Dr. Bogdan Nowakowski, MD, warned that Mr. Watkins cannot be subjected to "excessive

physical activity," "dust," or "chemical exposure." Mr. Watkins would be exposed to each of these hazards by the Assistant Operator role to which he was demoted. The IDR made clear that these limitations restrict Mr. Watkins's work. Plaintiff has sent IDRs every month of 2024 from both his pulmonary doctor and his neck and spinal doctor.

44.

On June 11, 2024, Ms. Hayden ordered Plaintiff to attend a Mandatory Clinic Visit at the chemical plant, despite his documented accommodation needs stating "No Dust, No Chemical Exposure." Under the threat of termination and extreme stress, Plaintiff complied on June 13, 2024, whereupon he suffered a moderate pulmonary episode. A Contract Security Officer revealed that the facility had recently experienced a Benzene leak and tank release, exacerbating Plaintiff's condition and placing him in direct conflict with his physician's directives.

45.

A similar event occurred on October 14, 2024, when Exxon again forced Plaintiff to attend a clinic visit at the contaminated site, again violating his medical accommodations. Though Plaintiff was told on November 4, 2024, by HR representative Shayla Reed that a job search was being initiated to place him in a more suitable position, Exxon limited this search to the Baton Rouge area, in violation of internal protocol which requires a nationwide search. Despite Exxon's extensive operations and job availability across the country, Plaintiff was told on December 11, 2024, that no positions were available and he would be forced to resign from his position. These actions establish a clear attempt by Defendant to constructively discharge Mr. Watkins rather than provide accommodations for his documented medical condition.

46.

Moreover, evidence of systemic discriminatory animus towards African American

11

employees at Exxon is well documented. Between 2016 and 2020, nooses were found at the Baton Rouge facility on five separate occasions, a symbol of racial terror that Exxon failed to address meaningfully. Notably, employees who engaged in racist conduct, including Mr. Leger, who was reported for hate speech, and Mr. Wesson, who posted hate speech online, were rewarded with promotions rather than held accountable, fostering a hostile working environment that rewarded bad actors.

47.

Plaintiff was subjected to disparate treatment on the basis of his race when Exxon refused to accommodate his disabilities, despite having made accommodations available to similarly situated Caucasian employees. Exxon demonstrated a pattern of selectively creating or modifying roles to support white employees with medical limitations, while denying similar flexibility to its African American employees.

48.

Exxon created a temporary "Improve Coordinator" position exclusively for Jim Hall, a Caucasian employee, to accommodate his neck injury. The role began and ended with Mr. Hall and was not offered to any other employee, underscoring its tailored nature and Exxon's willingness to adjust job duties when the employee is white.

49.

Similarly, Cody Harrison, another Caucasian employee hired on the same date as Plaintiff, was diagnosed with testicular cancer and missed extensive time from work. Nonetheless, Mr. Harrison was promoted to First Line Supervisor in 2020, demonstrating that Exxon not only accommodated his medical needs but continued to advance his career.

50.

In contrast, Gary Johnson, an African American former employee, suffered from severe back problems that required surgery. Despite requesting accommodations, Mr. Johnson was forced to continue working in the physically demanding Assistant Operator position and was never granted relief or modifications to his role.

51.

Likewise, Burke Burkhalter, an African American disabled veteran with documented back injuries and tinnitus resulting from an 18-wheeler accident, has remained in the Assistant Operator position and continues to be subjected to strenuous manual labor without any accommodation.

52.

Plaintiff was subjected to racially disparate discipline, forced into physically dangerous roles incompatible with his medical condition, and ultimately forced out of the workplace, all while Exxon shielded white employees from accountability and retaliated against Plaintiff for asserting his rights, in violation of Title VII of the Civil Rights Act of 1964.

53.

Mr. Watkins was subjected to a hostile work environment. Mr. Watkins alleges that, through discovery based on these allegations, Mr. Watkins will prove defendant did in fact foster a hostile work environment based under Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e et seq.

54.

In support of Mr. Watkins's allegation of hostile work environment under 42 U.S.C. § 1981, Mr. Watkins further alleges:

55.

Mr. Watkins, an African American male, asserts a hostile work environment claim under

42 U.S.C. § 1981.

56.

Throughout his employment with Exxon, Mr. Watkins was subjected to persistent racial harassment, discriminatory treatment, and racially motivated retaliation that was severe, pervasive, and objectively offensive. This conduct unreasonably interfered with his work performance and deprived him of the right to enjoy the full and equal benefit of his contractual employment relationship.

57.

Exxon permitted and condoned an environment in which racially derogatory comments and conduct were routinely directed toward Mr. Watkins and other Black employees.

58.

In 2012, Supervisor Chip Leger referred to Mr. Watkins and another Black coworker as "dogs." In the same year, Trainer Greg Campagna made offensive generalizations about Black people being unemployed and reliant on government assistance. In 2013, Mr. Leger mocked Mr. Watkins's friendships with Black contractors, stating he must "like hanging out with prisoners."

59.

In 2016, Mr. Watkins was subjected to a blatant racial slur when coworker Jeff Hebert said, "What's the matter Kasey, you not hanging with the N*ggers today?" In 2017, Hebert made a racially charged remark that "they all look alike," after a contractor confused two Black employees. Exxon's management took no corrective action after these incidents, signaling tacit approval.

60.

In 2020, Supervisors Darian Wesson and Andrew McCain posted racist statements to

social media glorifying violence against Black people. Wesson wrote, "All the Rope in Texas, Find a Tall Oak Tree," and said Black people "should be Hung High in The Street." Exxon took no disciplinary action against them. Instead, both were later promoted.

61.

When Mr. Watkins and other Black employees spoke out about the hateful social media posts, Supervisor Francis Jackson attempted to silence them by offering overtime and promotions in exchange for their silence. Mr. Watkins refused and experienced increased hostility and scrutiny thereafter.

62.

In addition to verbal harassment, Exxon enforced workplace rules in a racially biased manner and imposed unfair treatment on Mr. Watkins because of his race, compounding the hostile environment.

63.

Between October and November 2021, Mr. Watkins was repeatedly selected for drug testing. Although Exxon claimed the testing was random, a nurse disclosed that Supervisor Richard Lemoine had handpicked Mr. Watkins for the drug test(s). Bridget Reed also confirmed that Lemoine said Black employees, like Mr. Watkins, should be drug tested. White employees were not subjected to similar testing.

64.

Mr. Watkins reported over 30 instances between 2019 and 2023 in which White employees committed safety violations or slept while on duty without facing discipline. By contrast, Black employees were routinely disciplined.

65.

15

Despite being repeatedly recognized as a top performer, Mr. Watkins was passed over for promotions in favor of less-qualified white employees. Many of those promoted had prior disciplinary issues or lacked Mr. Watkins's level of experience and achievement.

66.

On June 6, 2022, Plaintiff suffered a serious spinal injury after being rear-ended at a red light. As a result, he was diagnosed with cervical and lumbar disc herniations, requiring ongoing medical treatment, including injections and ultimately corrective surgery. Despite these limitations, Plaintiff remained capable of performing his job, which did not involve manual labor.

67.

On or about September 9, 2022, Richard Lemoine, a decision-maker and supervisor, admitted to another employee, Kevin Taylor Jr., that he was "biased," "grew up biased," and that "bias was in his work." Lemoine further acknowledged that although he valued Plaintiff's skills and expertise, he had a preference for promoting Caucasian employees. Despite this clear admission of racial bias, Exxon allowed Lemoine to continue supervising Plaintiff and other African American employees, placing them at a disadvantage in promotional decisions.

68.

In March 2023, Plaintiff submitted updated medical documentation to Exxon's HR department outlining limitations from his spinal injuries. His treating physician restricted him to light duty, citing a reduced range of motion and an inability to lift heavy objects. Plaintiff's position did not require physical labor, and he remained fully capable of performing his job duties effectively.

69.

In May 2023, Lemoine made a racially charged statement in Plaintiff's presence. While

speaking to a Caucasian contractor, Lemoine said, "Just another day at the circus, making monkeys jump through fire," a comment that, in context and content, invoked deeply offensive racial imagery directed toward African American employees.

70.

Despite Plaintiff's qualifications and a prior recommendation for promotion to Shift Team Leader in 2019, Exxon instead promoted a white employee, Jacob Bennett, in September 2023. Bennett had a documented history of sleeping on the job and was widely regarded as a poor performer. Plaintiff was told that he lacked sufficient tenure, a justification that appears pretextual given his prior endorsement and superior performance.

71.

On November 7, 2023, Human Resources requested that Plaintiff update his workplace accommodation records. In internal communications, HR Representative Sarah Hayden, who is Caucasian, acknowledged that Exxon had the discretion to disregard Plaintiff's medical restrictions, effectively undermining the legitimacy of his documented medical condition. This discretionary approach was not evenly applied to similarly situated non-Black employees.

72.

On or about November 12, 2023, Plaintiff was observed with his cell phone on his desk during a shift where he had no active post responsibility. Per Exxon's policies, personal phone use under these circumstances warrants, at most, an oral reminder. However, Plaintiff, unlike similarly situated Caucasian supervisors, who regularly used their phones without consequence, was instead demoted just days later on or about November 15, 2023, from his position in the Supervisor Program to the physically demanding role of Assistant Operator.

73.

17

This demotion constituted a significant change in job responsibilities and was inconsistent with Plaintiff's medical restrictions. As a result of prior spinal injuries, Plaintiff's doctor had clearly stated in his November 7, 2023, disclosure that he could not safely perform tasks such as: climbing towers, operating heavy machinery, or lifting heavy objects. Despite this, Exxon reassigned Plaintiff to a role requiring those very tasks, setting the stage for foreseeable harm.

74.

On November 18, 2023, Plaintiff experienced a cardiac episode and was diagnosed with cardiomegaly. He promptly notified Exxon. Due to the cardiomegaly, Plaintiff was advised that dust and chemical exposure are causing his pulmonary symptoms.

75.

On or about November 25, 2023, supervisors Mr. Lemoine and Ms. Avillar altered Plaintiff's work schedule without informing him, creating the risk of an unexcused absence, a tactic that could be used pretextually to justify termination.

76.

On November 27, 2023, Plaintiff notified five Exxon officials that he could not perform his demoted duties due to disability-related restrictions. On December 19, 2023, Plaintiff submitted an Individual Disability Report (IDR) to Exxon's Site Occupational Health Manager, Dr. Holly Chaney, confirming he was unfit for work until February 2024. Despite receiving and acknowledging the IDR, Exxon representatives continued to misrepresent and downplay Plaintiff's medical limitations.

77.

Plaintiff has sent IDRs every month from December 2023 to December 2024 from both his pulmonary doctor and his neck and spinal doctor. Dr. Bogdan Nowakowski, MD, warned that Mr.

Watkins cannot be subject to "excessive physical activity," "dust," or "chemical exposure." Mr. Watkins would be exposed to each of these hazards by the Assistant Operator role to which he was demoted. The IDR made clear that these limitations restrict Mr. Watkins from working as an Assistant Operator.

78.

Exxon's Occupational Health nurse Greg Grizzafi falsely claimed that Plaintiff's doctor's office had cleared him for limited-duty work, despite a signed IDR from Dr. Fred DeFrancesch stating Plaintiff was "unfit for any type of work" through June 2024.

79.

Plaintiff filed a formal Charge of Discrimination with the EEOC on or about February 8, 2024, citing racial and disability discrimination as well as retaliation. Shortly thereafter, Exxon HR representatives, including Sarah Hayden, who had been involved in prior accommodation discussions launched an internal investigation aimed at undermining Plaintiff's claims, rather than addressing the underlying misconduct.

80.

In a letter dated March 19, 2024, Exxon BRCX IAS Process Department Head Cal Ebey demanded that Mr. Watkins submit yet another new IDR form memorializing his medical conditions by March 26, 2024, threatening to cease his short-term disability benefits and subject him to discipline, "including termination."

81.

On June 11, 2024, Ms. Hayden ordered Plaintiff to attend a mandatory clinic visit at the chemical plant, despite his documented accommodation needs stating "No Dust, No Chemical Exposure." Under the threat of termination and extreme stress, Plaintiff complied on June 13,

19

2024, whereupon he suffered a moderate pulmonary episode. A Contract Security Officer revealed that the facility had recently experienced a Benzene leak and tank release, exacerbating Plaintiff's condition and placing him in direct conflict with his physician's directives.

82.

A similar event occurred on October 14, 2024, when Exxon again forced Plaintiff to attend a clinic visit at the contaminated site, again violating his medical accommodations. Though Plaintiff was told on November 4, 2024, by HR representative Shayla Reed that a job search was being initiated to place him in a suitable position, Exxon limited this search to the Baton Rouge area, in violation of internal protocol which requires a nationwide search. Despite Exxon's extensive operations and job availability across the country, Plaintiff was told by December 11, 2024, that no positions were available and he was effectively forced to resign, a constructive discharge stemming from Exxon's refusal to accommodate his medical condition.

83.

Moreover, the discriminatory animus toward African American employees at Exxon is well documented. Between 2016 and 2020, nooses were found at the Baton Rouge facility on five separate occasions, a symbol of racial terror that Exxon failed to address meaningfully. Notably, employees who engaged in racist conduct, including Mr. Leger, who was reported for hate speech, and Mr. Wesson, who posted hate speech online, were rewarded with promotions rather than held accountable.

84.

Plaintiff was subjected to disparate treatment on the basis of his race when Exxon refused to accommodate his disabilities, despite having made such accommodations available to similarly situated Caucasian employees. Exxon has demonstrated a pattern of selectively creating or

modifying roles to support white employees with medical limitations, while denying similar flexibility to African American employees.

85.

For example, Exxon created a temporary "Improve Coordinator" position exclusively for Jim Hall, a Caucasian employee, to accommodate his neck injury. The role began and ended with Mr. Hall and was not offered to any other employee, underscoring its tailored nature and Exxon's willingness to adjust job duties when the employee is white.

86.

Similarly, Cody Harrison, another Caucasian employee hired on the same date as Plaintiff, was diagnosed with testicular cancer and missed extensive time from work. Nonetheless, Mr. Harrison was promoted to First Line Supervisor in 2020, demonstrating that Exxon not only accommodated his medical needs but continued to advance his career.

85.

In contrast, Gary Johnson, an African American former employee, whom suffered from severe back problems that required surgery. Despite requesting accommodations, Mr. Johnson was forced to continue working in the physically demanding Assistant Operator position and was never granted relief or modifications to his role.

87.

Likewise, Burke Burkhalter, an African American disabled veteran with documented back injuries and tinnitus resulting from an 18-wheeler accident, has remained in the Assistant Operator position and continues to be subjected to strenuous manual labor without any accommodation.

88.

These facts demonstrate that Mr. Watkins was subjected to ongoing racial harassment,

differential treatment, and retaliation, creating a hostile work environment in violation of 42 U.S.C. § 1981. This conduct was not isolated but rather a sustained pattern of discrimination and abuse, tolerated and perpetuated by Exxon's management.

89.

Mr. Watkins was subjected to a hostile work environment. Mr. Watkins alleges that, through discovery based on these allegations, Mr. Watkins will prove defendant did in fact foster a hostile work environment based under 42 U.S.C. § 1981.

90.

In support of Mr. Watkins's allegation of racial discrimination under Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e et seq. Mr. Watkins further alleges:

91.

Plaintiff, Mr. Watkins, is an African American male with a known spinal injury and cardiomegaly, placing him within multiple protected classes under federal law.

92.

During his employment with ExxonMobil, Plaintiff was subjected to pervasive and ongoing racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

93.

Despite repeated internal complaints, ExxonMobil failed to provide Mr. Watkins with a safe and discrimination-free workplace. Plaintiff made numerous complaints regarding racial harassment and disparate treatment, but management took no meaningful action to remedy the hostile environment. ExxonMobil afforded white employees protections, opportunities, and fair treatment that it denied to Plaintiff. Had Plaintiff been Caucasian, he would have been treated

equitably and afforded a safe working environment.

94.

Plaintiff worked in Exxon's Low Pressure OXO Supervisor Program, primarily under the supervision of First Line Supervisor Richard Lemoine (Caucasian). Throughout his tenure, Plaintiff was repeatedly subjected to racist conduct by white supervisors and coworkers that went unpunished by Exxon management.

95.

In November 2012, First Line Supervisor Chip Leger (Caucasian) referred to Plaintiff and another African American employee, Jeremy Phillips, as "dogs." Although another supervisor, Jason McClanahan (Caucasian), acknowledged the comment was inappropriate, no corrective action was taken.

96.

In December 2012, Trainer Greg Campagna (Caucasian) made racially derogatory remarks suggesting African Americans were lazy and preferred "to chill in the hood and drink their 40s."

97.

In Fall 2013, Mr. Leger again made a racist remark, mocking Plaintiff for speaking with African American contractors wearing orange jumpsuits, stating, "You seem to be real fond of prisoners huh Jamarsae?"

98.

Plaintiff was promoted to Supervisor in 2016, after which he became the target of increased hostility from white coworkers. In Summer 2016, Jeff Hebert (Caucasian) made a racist comment within Plaintiff's presence, stating, "What's the matter Kasey, you not hanging with the N*ggers today?" Another African American employee, Tyrus Mabry, confirmed that Hebert had made

similar comments on other occasions.

99.

In Fall 2017, Mr. Hebert again displayed racial bias by telling a contractor, "Don't worry about it man, they all look alike," after confusing two African American workers.

100.

Although Plaintiff demonstrated superior qualifications and job performance, his advancement was routinely blocked.

101.

In 2018, Supervisor Jarvis Hays acknowledged that Plaintiff was next in line for promotion and would soon be given the opportunity to train as Second Operations Controller.

102.

By Fall 2019, Plaintiff learned that he was ranked the second-best performer out of 30 employees in the OXO Low Pressure Supervisor Program.

103.

In June 2023, First Line Supervisor Andrew McCain informed Plaintiff that there was a consensus in the unit that he was the "smartest man."

104.

Despite these acknowledgments, from 2019 through 2021, Plaintiff observed and documented widespread misconduct by white employees including sleeping on duty, improper use of cell phones, and safety violations for which they faced no discipline. In stark contrast, Plaintiff and other African American employees were punished or demoted for minor infractions or fabricated charges.

105.

In June 2020, during the national George Floyd protests, white supervisors Darian Wesson and Andrew McCain posted violent, racist comments on Facebook calling for the lynching and shooting of Black individuals. For example, Wesson wrote: "All the rope in Texas, find a tall oak tree", a reference to lynching. Despite the gravity of these statements, ExxonMobil promoted both men instead of disciplining them.

106.

When Plaintiff and other Black employees raised concerns, management, specifically Second Line Supervisor Francis Jackson (Caucasian) attempted to suppress complaints by offering promotions or overtime assignments as bribes. While some employees accepted, Plaintiff refused to remain silent and was subsequently targeted for retaliation.

107.

From 2020 to 2021, Plaintiff was repeatedly denied promotions for which he was fully qualified. He was excluded from the Process Mechanical Coordinator Supervisor role, which was instead given to less qualified white employees, including: Cody Harrison, Clint Perry, Jacob Bennett, Blaine English, Kevin Tassin, Hunter Bill, Tim Smith, Darren Chauvin, and Mark Chaney. Many of these individuals had serious performance deficiencies, disciplinary histories, and/or operational infractions.

108.

Mr. Chauvin, Mr. Smith, Mr. Perry, and Mr. English had nearly been terminated from the Supervisor Program due to poor performance. Nonetheless, they were promoted, while Plaintiff was passed over. When Plaintiff reported this disparate treatment to Department Head Andrew Ryskoski (Caucasian) and Supervisor Natasha Alvillar (Indian), his complaints were ignored.

109.

In October and November 2021, Plaintiff was subjected to excessive drug testing. Although the tests were labeled "random," a medical technician disclosed that the selections were made at the direction of Supervisor Richard Lemoine. Bridget Reed later informed Plaintiff that the testing was being used to fabricate grounds for termination. On information and belief, Mr. Lemoine had also made Facebook posts expressing the view that African Americans should be drug tested. White employees were not subjected to the same level of testing. Despite these discriminatory efforts, Plaintiff passed all tests.

110.

Even as white employees like Clint Perry and Jacob Bennett committed serious violations including causing oil spills and violating safety protocol, they were promoted rather than disciplined. In contrast, Plaintiff continued to face heightened scrutiny and differential treatment. In December 2021, Plaintiff submitted a leadership feedback survey reporting that Mr. Lemoine used race as a basis for discipline and evaluation. He explained that Mr. Lemoine sought to disadvantage Black employees and protect white ones. No action was taken from the survey.

111.

From 2022 to 2023, Plaintiff documented over 30 incidents of white employees sleeping on duty, failing to perform essential tasks, or misusing equipment without consequence. Despite providing this information to Exxon management, the company failed to investigate or discipline the employees involved.

112.

On June 6, 2022, Plaintiff suffered a serious spinal injury after being rear-ended at a red light. As a result, he was diagnosed with cervical and lumbar disc herniations, requiring ongoing medical treatment, including injections and ultimately corrective surgery. Despite these

limitations, Plaintiff remained capable of effectively performing his job, which did not involve manual labor.

113.

On or about September 9, 2022, Richard Lemoine, a decision-maker and supervisor, admitted to another employee, Kevin Taylor Jr., that he was "biased," "grew up biased," and that "bias was in his work." Lemoine further acknowledged that although he valued Plaintiff's skills and expertise, he had a preference for promoting Caucasian employees. Despite this clear admission of racial bias, Exxon allowed Lemoine to continue supervising Plaintiff and other African American employees, placing them at a disadvantage in promotional decisions.

114.

In March 2023, Plaintiff submitted updated medical documentation to Exxon's HR department outlining limitations from his spinal injuries. His treating physician restricted him to light duty, citing reduced range of motion and an inability to lift heavy objects. Plaintiff's position did not require physical labor, and he remained fully capable of performing his job duties effectively.

115.

In May 2023, Lemoine made a racially charged statement in Plaintiff's presence. While speaking to a Caucasian contractor, Lemoine said, "Just another day at the circus, making monkeys jump through fire," a comment that, in context and content, invoked deeply offensive racial imagery directed toward African American employees.

116.

Despite Plaintiff's qualifications and a prior recommendation for promotion to Shift Team Leader in 2019, Exxon instead promoted a white employee, Jacob Bennett, in September 2023.

27

Bennett had a documented history of sleeping on the job and was widely regarded as a poor performer. Plaintiff was told that he lacked sufficient tenure, a justification that appears pretextual given his prior endorsement and superior performance.

117.

On November 7, 2023, Human Resources requested that Plaintiff update his workplace accommodation records. In internal communications, HR Representative Sarah Hayden, who is Caucasian, acknowledged that Exxon had the discretion to disregard Plaintiff's medical restrictions, effectively undermining the legitimacy of his documented medical condition. This discretionary approach was not evenly applied to similarly situated non-Black employees.

118.

On or about November 12, 2023, Plaintiff was observed with his cell phone on his desk during a shift where he had no active post responsibility. Per Exxon's policies, personal phone use under these circumstances warrants, at most, an oral reminder. However, Plaintiff, unlike similarly situated Caucasian supervisors, who regularly used their phones without consequence, was instead demoted just days later, on or about November 15, 2023, from his position in the Supervisor Program to the physically demanding role of Assistant Operator.

119.

This demotion constituted a significant change in job responsibilities and was inconsistent with Plaintiff's medical restrictions. As a result of prior spinal injuries, Plaintiff's doctor had clearly stated in his November 7, 2023, disclosure that he could not safely perform tasks such as: climbing towers, operating heavy machinery, or lifting heavy objects. Despite this, Exxon reassigned Plaintiff to a role requiring those very tasks, setting the stage for foreseeable harm.

120.

On November 18, 2023, Plaintiff experienced a cardiac episode and was diagnosed with cardiomegaly. He promptly notified Exxon.

121.

On or about November 25, 2023, supervisors Mr. Lemoine and Ms. Avillar altered Plaintiff's work schedule without informing him, creating the risk of an unexcused absence, a tactic that could be used pretextually to justify termination.

122.

On November 27, 2023, Plaintiff notified five Exxon officials that he could not perform his demoted duties due to disability-related restrictions. On December 19, 2023, Plaintiff submitted an Individual Disability Report (IDR) to Exxon's Site Occupational Health Manager, Dr. Holly Chaney, confirming he was unfit for work until February 2024. Despite receiving and acknowledging the IDR, Exxon representatives continued to misrepresent and downplay Plaintiff's medical limitations.

123.

This pattern repeated in February 2024, when Exxon's Occupational Health nurse Greg Grizzafi falsely claimed that Plaintiff's doctor's office had cleared him for limited-duty work, despite a signed IDR from Dr. Fred DeFrancesch stating Plaintiff was "unfit for any type of work" through June 2024.

124.

Plaintiff filed a formal Charge of Discrimination with the EEOC on or about February 8, 2024, citing racial and disability discrimination as well as retaliation. Shortly thereafter, Exxon HR representatives, including Sarah Hayden, who had been involved in prior accommodation discussions launched an internal investigation aimed at undermining Plaintiff's claims, rather than

addressing the underlying misconduct.

125.

On June 11, 2024, Ms. Hayden ordered Plaintiff to attend a mandatory clinic visit at the chemical plant, despite his documented accommodation needs stating "No Dust, No Chemical Exposure." Under the threat of termination and extreme stress, Plaintiff complied on June 13, 2024, whereupon he suffered a moderate pulmonary episode. A Contract Security Officer revealed that the facility had recently experienced a Benzene leak and tank release, exacerbating Plaintiff's condition and placing him in direct conflict with his physician's directives.

126.

A similar event occurred on October 14, 2024, when Exxon again forced Plaintiff to attend a clinic visit at the contaminated site, again violating his medical accommodations. Though Plaintiff was told on November 4, 2024, by HR representative Shayla Reed that a job search was being initiated to place him in a suitable position, Exxon limited this search to the Baton Rouge area, in violation of internal protocol which requires a nationwide search. Despite Exxon's extensive operations and job availability across the country, Plaintiff was told by December 11, 2024, that no positions were available and he was effectively forced to resign, a constructive discharge stemming from Exxon's refusal to accommodate his medical condition.

127.

Moreover, the discriminatory animus toward African American employees at Exxon is well documented. Between 2016 and 2020, nooses were found at the Baton Rouge facility on five separate occasions, a symbol of racial terror that Exxon failed to address meaningfully. Notably, employees who engaged in racist conduct, including Mr. Leger, who was reported for hate speech, and Mr. Wesson, who posted hate speech online, were rewarded with promotions rather than held

accountable.

128.

Plaintiff was subjected to disparate treatment on the basis of his race when Exxon refused to accommodate his disabilities, despite having made such accommodations available to similarly situated Caucasian employees. Exxon has demonstrated a pattern of selectively creating or modifying roles to support white employees with medical limitations, while denying similar flexibility to African American employees.

129.

For example, Exxon created a temporary "Improve Coordinator" position exclusively for Jim Hall, a Caucasian employee, to accommodate his neck injury. The role began and ended with Mr. Hall and was not offered to any other employee, underscoring its tailored nature and Exxon's willingness to adjust job duties when the employee is white.

130.

Similarly, Cody Harrison, another Caucasian employee hired on the same date as Plaintiff, was diagnosed with testicular cancer and missed extensive time from work. Nonetheless, Mr. Harrison was promoted to First Line Supervisor in 2020, demonstrating that Exxon not only accommodated his medical needs but continued to advance his career.

131.

In contrast, Gary Johnson, an African American former employee, whom suffered from severe back problems that required surgery. Despite requesting accommodations, Mr. Johnson was forced to continue working in the physically demanding Assistant Operator position and was never granted relief or modifications to his role.

132.

Likewise, Burke Burkhalter, an African American disabled veteran with documented back injuries and tinnitus resulting from an 18-wheeler accident, has remained in the Assistant Operator position and continues to be subjected to strenuous manual labor without any accommodation.

133.

These examples highlight a racial disparity in how Exxon responds to disability and medical needs, favoring white employees for job modifications, light duty, and promotions, while denying African American employees equal treatment, in violation of Title VII of the Civil Rights Act of 1964.

134.

Mr. Watkins was subjected to racial discrimination. Mr. Watkins alleges that, through discovery based on these allegations, will prove defendant did in fact engage in intentional racial discrimination in the terms and conditions of his employment under Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e et seq.

135.

In support of Mr. Watkins's allegations of racial discrimination under 42 U.S.C. § 1981, Mr. Watkins further alleges:

136.

Plaintiff, Mr. Watkins, is an African American and a member of a protected class under 42 U.S.C. § 1981, which prohibits employment discrimination on the basis of race.

137.

Throughout his employment with Exxon, Mr. Watkins was subjected to persistent racial harassment, discriminatory treatment, and racially motivated retaliation that was severe, pervasive, and objectively offensive. This conduct unreasonably interfered with his work performance and

deprived him of the right to enjoy the full and equal benefit of his contractual employment relationship.

138.

Despite repeated internal complaints, ExxonMobil failed to provide Mr. Watkins with a safe and discrimination-free workplace. Plaintiff made numerous complaints regarding racial harassment and disparate treatment, but management took no meaningful action to remedy the hostile environment. ExxonMobil afforded white employees protections, opportunities, and fair treatment that it denied to Plaintiff. Had Plaintiff been Caucasian, he would have been treated equitably and afforded a safe working environment.

139.

Plaintiff worked in Exxon's Low Pressure OXO Supervisor Program, primarily under the supervision of First Line Supervisor Richard Lemoine (Caucasian). Throughout his tenure, Plaintiff was repeatedly subjected to racist conduct by white supervisors and coworkers that went unpunished by Exxon management.

140.

In November 2012, First Line Supervisor Chip Leger (Caucasian) referred to Plaintiff and another African American employee, Jeremy Phillips, as "dogs." Although another supervisor, Jason McClanahan (Caucasian), acknowledged the comment was inappropriate, no corrective action was taken.

141.

In December 2012, Trainer Greg Campagna (Caucasian) made racially derogatory remarks suggesting African Americans were lazy and preferred "to chill in the hood and drink their 40s."

142.

33

In Fall 2013, Mr. Leger again made a racist remark, mocking Plaintiff for speaking with African American contractors wearing orange jumpsuits, stating, "You seem to be real fond of prisoners huh Jamarsae?"

143.

Plaintiff was promoted to Supervisor in 2016, after which he became the target of increased hostility from white coworkers. In Summer 2016, Jeff Hebert (Caucasian) made a racist comment within Plaintiff's presence, stating, "What's the matter Kasey, you not hanging with the N*ggers today?" Another African American employee, Tyrus Mabry, confirmed that Hebert had made similar comments on other occasions.

144.

In Fall 2017, Mr. Hebert again displayed racial bias by telling a contractor, "Don't worry about it man, they all look alike," after confusing two African American workers.

145.

Although Plaintiff demonstrated superior qualifications and job performance, his advancement was routinely blocked.

146.

In 2018, Supervisor Jarvis Hays acknowledged that Plaintiff was next in line for promotion and would soon be given the opportunity to train as Second Operations Controller.

147.

By Fall 2019, Plaintiff learned that he was ranked the second-best performer out of 30 employees in the OXO Low Pressure Supervisor Program.

148.

In June 2023, First Line Supervisor Andrew McCain informed Plaintiff that there was a

consensus in the unit that he was the "smartest man."

149.

Despite these acknowledgments, from 2019 through 2021, Plaintiff observed and documented widespread misconduct by white employees including sleeping on duty, improper use of cell phones, and safety violations for which they faced no discipline. In stark contrast, Plaintiff and other African American employees were punished or demoted for minor infractions or fabricated charges.

150.

In June 2020, during the national George Floyd protests, white supervisors Darian Wesson and Andrew McCain posted violent, racist comments on Facebook calling for the lynching and shooting of Black individuals. For example, Wesson wrote: "All the rope in Texas, find a tall oak tree", a reference to lynching. Despite the gravity of these statements, ExxonMobil promoted both men instead of disciplining them.

151.

When Plaintiff and other Black employees raised concerns, management, specifically Second Line Supervisor Francis Jackson (Caucasian) attempted to suppress complaints by offering promotions or overtime assignments as bribes. While some employees accepted, Plaintiff refused to remain silent and was subsequently targeted for retaliation.

152.

From 2020 to 2021, Plaintiff was repeatedly denied promotions for which he was fully qualified. He was excluded from the Process Mechanical Coordinator Supervisor role, which was instead given to less qualified white employees, including Cody Harrison, Clint Perry, Jacob Bennett, Blaine English, Kevin Tassin, Hunter Bill, Tim Smith, Darren Chauvin, and Mark

Chaney. Many of these individuals had serious performance deficiencies, disciplinary histories, or operational infractions.

153.

Mr. Chauvin, Mr. Smith, Mr. Perry, and Mr. English had nearly been terminated from the Supervisor Program due to poor performance. Nonetheless, they were promoted, while Plaintiff was passed over. When Plaintiff reported this disparate treatment to Department Head Andrew Ryskoski (Caucasian) and Supervisor Natasha Alvillar (Indian), his complaints were ignored.

154.

In October and November 2021, Plaintiff was subjected to excessive drug testing. Although the tests were labeled "random," a medical technician disclosed that the selections were made at the direction of Supervisor Richard Lemoine. Bridget Reed later informed Plaintiff that the testing was being used to fabricate grounds for termination. On information and belief, Mr. Lemoine had also made Facebook posts expressing the view that African Americans should be drug tested. White employees were not subjected to the same level of testing. Despite these discriminatory efforts, Plaintiff passed all tests.

155.

Even as white employees like Clint Perry and Jacob Bennett committed serious violations including causing oil spills and violating safety protocol, they were promoted rather than disciplined. In contrast, Plaintiff continued to face heightened scrutiny and differential treatment. In December 2021, Plaintiff submitted a leadership feedback survey reporting that Mr. Lemoine used race as a basis for discipline and evaluation. He explained that Mr. Lemoine sought to disadvantage Black employees and protect white ones. No action was taken.

156.

From 2022 to 2023, Plaintiff documented over 30 incidents of white employees sleeping on duty, failing to perform essential tasks, and/or misusing equipment without consequence. Despite providing this information to Exxon management, the company failed to investigate or discipline the employees involved.

157.

On June 6, 2022, Plaintiff suffered a serious spinal injury after being rear-ended at a red light. As a result, he was diagnosed with cervical and lumbar disc herniations, requiring ongoing medical treatment, including injections and ultimately corrective surgery. Despite these limitations, Plaintiff remained capable of effectively performing his job, which did not involve manual labor.

158.

On or about September 9, 2022, Richard Lemoine, a decision-maker and supervisor, admitted to another employee, Kevin Taylor Jr., that he was "biased," "grew up biased," and that "bias was in his work." Lemoine further acknowledged that although he valued Plaintiff's skills and expertise, he had a preference for promoting Caucasian employees. Despite this clear admission of racial bias, Exxon allowed Lemoine to continue supervising Plaintiff and other African American employees, placing them at a disadvantage in promotional decisions.

159.

In March 2023, Plaintiff submitted updated medical documentation to Exxon's HR department outlining limitations from his spinal injuries. His treating physician restricted him to light duty, citing a reduced range of motion and an inability to lift heavy objects. Plaintiff's position did not require physical labor, and he remained fully capable of performing his job duties effectively.

160.

In May 2023, Lemoine made a racially charged statement in Plaintiff's presence. While speaking to a Caucasian contractor, Lemoine said, "Just another day at the circus, making monkeys jump through fire," a comment that, in context and content, invoked deeply offensive racial imagery directed toward African American employees.

161.

Despite Plaintiff's qualifications and a prior recommendation for promotion to Shift Team Leader in 2019, Exxon instead promoted a white employee, Jacob Bennett, in September 2023. Bennett had a documented history of sleeping on the job and was widely regarded as a poor performer. Plaintiff was told that he lacked sufficient tenure, a justification that appears pretextual given his prior endorsement and superior performance.

162.

On November 7, 2023, Human Resources requested that Plaintiff update his workplace accommodation records. In internal communications, HR Representative Sarah Hayden, who is Caucasian, acknowledged that Exxon had the discretion to disregard Plaintiff's medical restrictions, effectively undermining the legitimacy of his documented medical condition. This discretionary approach was not evenly applied to similarly situated non-Black employees.

163.

On or about November 12, 2023, Plaintiff was observed with his cell phone on his desk during a shift where he had no active post responsibility. Per Exxon's policies, personal phone use under these circumstances warrants, at most, an oral reminder. However, Plaintiff, unlike similarly situated Caucasian supervisors, who regularly used their phones without consequence was instead demoted just days later, on or about November 15, 2023, from his position in the Supervisor

Program to the physically demanding role of Assistant Operator.

164.

This demotion constituted a significant change in his job responsibilities and was inconsistent with Plaintiff's medical restrictions. As a result of prior spinal injuries, Plaintiff's doctor had clearly stated in his November 7, 2023, disclosure that he could not safely perform tasks such as: climbing towers, operating heavy machinery, or lifting heavy objects. Despite this, Exxon reassigned Plaintiff to a role requiring those very tasks, setting the stage for foreseeable harm.

165.

On November 18, 2023, Plaintiff experienced a cardiac episode and was diagnosed with cardiomegaly. He promptly notified Exxon.

166.

On or about November 25, 2023, supervisors Mr. Lemoine and Ms. Avillar altered Plaintiff's work schedule without informing him, creating the risk of an unexcused absence, a tactic that could be used pretextually to justify termination.

167.

On November 27, 2023, Plaintiff notified five Exxon officials that he could not perform his demoted duties due to disability-related restrictions. On December 19, 2023, Plaintiff submitted an Individual Disability Report (IDR) to Exxon's Site Occupational Health Manager, Dr. Holly Chaney, confirming he was unfit for work until February 2024. Despite receiving and acknowledging the IDR, Exxon representatives continued to misrepresent and downplay Plaintiff's medical limitations.

168.

This pattern repeated in February 2024, when Exxon's Occupational Health nurse Greg Grizzafi falsely claimed that Plaintiff's doctor's office had cleared him for limited-duty work, despite a signed IDR from Dr. Fred DeFrancesch stating Plaintiff was "unfit for any type of work" through June 2024.

169.

Plaintiff filed a formal Charge of Discrimination with the EEOC on or about February 8, 2024, citing racial and disability discrimination as well as retaliation. Shortly thereafter, Exxon HR representatives, including Sarah Hayden, who had been involved in prior accommodation discussions launched an internal investigation aimed at undermining Plaintiff's claims, rather than addressing the underlying misconduct.

170.

On June 11, 2024, Ms. Hayden ordered Plaintiff to attend a mandatory clinic visit at the chemical plant, despite his documented accommodation needs stating "No Dust, No Chemical Exposure." Under the threat of termination and extreme stress, Plaintiff complied and on June 13, 2024, he suffered a moderate pulmonary episode. A Contract Security Officer revealed that the facility had recently experienced a Benzene leak and tank release, exacerbating Plaintiff's condition and placing him in direct conflict with his physician's directives.

171.

A similar event occurred on October 14, 2024, when Exxon again forced Plaintiff to attend a clinic visit at the contaminated site, again violating his medical accommodations. Though Plaintiff was told on November 4, 2024, by HR representative Shayla Reed that a job search was being initiated to place him in a suitable position, Exxon limited this search to the Baton Rouge area, in violation of internal protocol which requires a nationwide search. Despite Exxon's

extensive operations and job availability across the country, Plaintiff was told on December 11, 2024 that no positions were available and was effectively forced to resign, a constructive discharge stemming from Exxon's refusal to accommodate his medical condition.

172.

Moreover, the discriminatory animus toward African American employees at Exxon is well documented. Between 2016 and 2020, nooses were found at the Baton Rouge facility on five separate occasions, a symbol of racial terror that Exxon failed to address meaningfully. Notably, employees who engaged in racist conduct, including Mr. Leger, who was reported for hate speech, and Mr. Wesson, who posted hate speech online, were rewarded with promotions rather than held accountable.

173.

Plaintiff was subjected to disparate treatment on the basis of his race when Exxon refused to accommodate his disabilities, despite having made such accommodations available to similarly situated Caucasian employees. Exxon has demonstrated a pattern of selectively creating or modifying roles to support white employees with medical limitations, while denying similar flexibility to African American employees.

174.

For example, Exxon created a temporary "Improve Coordinator" position exclusively for Jim Hall, a Caucasian employee, to accommodate his neck injury. The role began and ended with Mr. Hall and was not offered to any other employee, underscoring its tailored nature and Exxon's willingness to adjust job duties when the employee is white.

175.

Similarly, Cody Harrison, another Caucasian employee hired on the same date as Plaintiff,

was diagnosed with testicular cancer and missed extensive time from work. Nonetheless, Mr. Harrison was promoted to First Line Supervisor in 2020, demonstrating that Exxon not only accommodated his medical needs but continued to advance his career.

176.

In contrast, Gary Johnson, an African American former employee, whom suffered from severe back problems that required surgery. Despite requesting accommodations, Mr. Johnson was forced to continue working in the physically demanding Assistant Operator position and was never granted relief or modifications to his role.

177.

Likewise, Burke Burkhalter, an African American disabled veteran with documented back injuries and tinnitus resulting from an 18-wheeler accident, has remained in the Assistant Operator position and continues to be subjected to strenuous manual labor without any accommodation.

178.

These examples highlight a racial disparity in how Exxon responds to disability and medical needs, favoring white employees for job modifications, light duty, and promotions, while denying African American employees equal treatment, in violation of 42 U.S.C. § 1981.

179.

Mr. Watkins was subjected to racial discrimination. Mr. Watkins alleges that, through discovery based on these allegations, will prove defendant did in fact engage in intentional racial discrimination in the terms and conditions of his employment under 42 U.S.C. § 1981.

180.

In support of his allegation of disability discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., Mr. Watkins further alleges:

181.

Plaintiff, Mr. Watkins, is an African American male with a known spinal injury and cardiomegaly, placing him within multiple protected classes under federal law.

182.

During his employment with ExxonMobil, Plaintiff was subjected to pervasive and ongoing disability discrimination in violation of the Americans with Disabilities Act of 1990.

183.

On June 6, 2022, Plaintiff sustained a severe spinal injury in a motor vehicle collision. Medical evaluation diagnosed him with cervical and lumbar disc herniations, requiring ongoing treatment including injections and future corrective surgery. Despite these impairments and medical restrictions, Plaintiff remained fully capable of performing the essential functions of his job, which did not involve manual labor or heavy physical exertion.

184.

In March 2023, Plaintiff submitted updated medical documentation to Exxon's Human Resources department detailing his work restrictions resulting from his spinal injury. His treating physician limited him to light-duty tasks due to reduced range of motion and an inability to lift heavy objects. Plaintiff's position, however, did not necessitate physical labor, and he was qualified to perform his job duties within these limitations.

185.

On or about November 7, 2023, Exxon's HR requested that Plaintiff update his accommodation records. Internal correspondence from HR Representative Sarah Hayden revealed that Exxon retained the discretion to disregard Plaintiff's documented medical restrictions, undermining the legitimacy of his disability accommodations. This discretionary treatment was

not applied equally to other employees without disabilities.

186.

Despite Plaintiff's documented medical restrictions and qualifications, Exxon demoted him on or about November 15, 2023, from a supervisory position to an Assistant Operator role requiring strenuous physical activities such as: climbing towers, operating heavy machinery, and lifting heavy objects, tasks Plaintiff's physician expressly prohibited him from performing. This reassignment was inconsistent with Plaintiff's medical limitations and placed him at risk of further injury.

187.

On November 18, 2023, Plaintiff experienced a serious cardiac episode and was diagnosed with cardiomegaly, a condition further complicating his health status. Plaintiff promptly informed Exxon of this new disability-related condition.

188.

Following this diagnosis, Exxon supervisors altered Plaintiff's work schedule without his knowledge, increasing the risk of unexcused absences that could be used as a pretext for disciplinary action or termination.

189.

Plaintiff repeatedly informed Exxon officials that he was unable to perform the physically demanding duties assigned to him due to his disabilities. On December 19, 2023, he submitted an Individual Disability Report from his treating physician confirming he was unfit for work until February 2024. Despite this, Exxon disregarded the medical evidence and misrepresented Plaintiff's capacity to work.

190.

In February 2024, Exxon's Occupational Health nurse falsely asserted that Plaintiff had been cleared for limited duty, contrary to a signed medical report stating he was unfit for any type of work through June 2024.

191.

On June 11, 2024, Exxon compelled Plaintiff to attend a mandatory clinic visit at a facility with documented chemical exposure risks, violating Plaintiff's reasonable accommodation request for "No Dust, No Chemical Exposure." As a direct result, Plaintiff suffered a pulmonary episode aggravated by exposure to a recent benzene leak at the site.

192.

On a similar occasion in October 2024, Exxon again required Plaintiff to attend a clinic visit in a contaminated environment, further violating his accommodation needs.

193.

Although Exxon was verbally committed to conducting a job search to find a suitable position for Plaintiff consistent with his restrictions, this search was limited geographically and contrary to Exxon's own protocols. By December 2024, Exxon informed Plaintiff that no appropriate positions were available, effectively forcing his resignation, a constructive discharge caused by Exxon's failure to provide reasonable accommodations.

194.

Exxon has demonstrated a pattern and practice of denying disability accommodations to African American employees, while granting tailored accommodations and even promotions to similarly situated Caucasian employees with medical limitations. For example, Exxon created a temporary "Improve Coordinator" role exclusively for a white employee with a neck injury and promoted another white employee undergoing cancer treatment.

45

195.

In stark contrast, African American employees with comparable disabilities, including those with back injuries or service-related conditions, were denied accommodations and forced to continue physically demanding work without relief.

196.

These facts demonstrate that Exxon subjected Plaintiff to disability discrimination by refusing to provide reasonable accommodations, assigning him to incompatible job duties, and ultimately forcing him out of employment, all in violation of the Americans with Disabilities Act of 1990.

197.

Mr. Watkins was subjected to disability discrimination. Mr. Watkins alleges that, through discovery based on these allegations, will prove defendant did in fact engage in intentional disability discrimination in the terms and conditions of his employment under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.

198.

In support of Mr. Watkins's allegation of retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., Mr. Watkins further alleges:

199.

Plaintiff, Mr. Watkins, is an African American male with a spinal injury and cardiomegaly, placing him in multiple protected categories under federal law.

200.

Throughout his employment, Plaintiff repeatedly reported racially discriminatory conduct and racially hostile treatment to ExxonMobil management, including racially charged remarks,

disparate discipline, and denial of equal opportunity.

201.

Despite these protected complaints, ExxonMobil failed to provide Mr. Watkins with a safe and non-discriminatory work environment. Plaintiff alleges that similarly situated Caucasian employees were not subjected to the same unsafe or retaliatory conditions and were, instead, protected and promoted.

202.

Plaintiff served in Exxon's Low Pressure OXO Supervisor Program under the supervision of First Line Supervisor Richard Lemoine (Caucasian), where he consistently faced racial hostility and unequal treatment.

203.

On or about November 2012, First Line Supervisor Chip Leger (Caucasian) referred to Plaintiff and another African American employee as "dogs." Although Supervisor Jason McClanahan (Caucasian) acknowledged the comment as inappropriate, ExxonMobil took no corrective action, failing to address racially derogatory behavior reported by Plaintiff.

204.

In December 2012, Trainer Greg Campagna (Caucasian) made stereotypical and racially offensive remarks about African Americans, suggesting they were lazy and preferred to "chill in the hood, and drink their 40s." These remarks were part of a racially hostile atmosphere Plaintiff documented and protested.

205.

In Fall 2013, Chip Leger mocked Plaintiff for speaking with African American contract workers wearing orange jumpsuits, implying racial association with criminality by stating, "you

seem to be real fond of prisoners huh Jamarsae?" This offensive comment was also not addressed by management despite Plaintiff's objections.

206.

In 2016, when Plaintiff was promoted to Supervisor, his advancement triggered racial resentment among certain white coworkers, which led to retaliatory false accusations and increased scrutiny, designed to undermine his new position and force him out.

207.

That same year, Jeff Hebert (Caucasian) made a racist comment in Plaintiff's presence: "What's the matter Kasey, you not hanging with the N*ggers today?" This and other similar comments were reported and witnessed by African American coworkers but were never disciplined, emboldening further retaliation against Plaintiff.

208.

In 2017, Jeff Hebert continued his offensive conduct, telling a contractor who confused Plaintiff with another African American employee, "Don't worry about it man, they all look alike." Plaintiff reported this pattern of racially hostile behavior but was ignored.

209.

By 2018, despite consistent top performance, Plaintiff was passed over for a promotion to First Line Supervisor. Supervisor Jarvis Hays had informed Plaintiff that he was next in line for training as a Second Operations Controller, but the opportunity was withheld after Plaintiff's continued complaints.

210.

In Fall 2019, Plaintiff was ranked as the second-best performer out of approximately 30 employees, and in a 2023 evaluation, was praised as "the smartest man in the unit." Nonetheless,

48

his complaints of racial bias and unequal treatment resulted in retaliation, not advancement.

211.

From 2019 to 2021, Plaintiff documented widespread misconduct by white employees sleeping on duty, improper phone use, and safety violations. While Plaintiff and other Black employees were disciplined or demoted for minor infractions, these white employees faced no consequences. Plaintiff's reporting of this disparity led to increased targeting by management.

212.

In June 2020, during the George Floyd protests, ExxonMobil supervisors Darian Wesson and Andrew McCain posted racist comments on Facebook calling for the lynching and shooting of Black people. Instead of being disciplined, both were promoted. Plaintiff, who objected to these posts and raised concerns, was later excluded from opportunities and retaliated against.

213.

Following those events, Second Line Supervisor Francis Jackson (Caucasian) called a meeting with six Black employees including Plaintiff and attempted to suppress their complaints by offering overtime and promotions. While some accepted, Plaintiff refused the bribe and continued to voice concerns. Soon after, he was subjected to adverse employment actions.

214.

Between 2020 and 2021, Plaintiff was denied promotions to the Process Mechanical Coordinator Supervisor role and other positions, despite being the top performer. These roles were instead given to underperforming or previously disciplined Caucasian employees, in retaliation for Plaintiff's prior complaints.

215.

Notably, Plaintiff was passed over in favor of individuals including Cody Harrison, Clint

49

Perry, Jacob Bennett, and others, many of whom had serious operational failures or disciplinary histories.

216.

After Plaintiff reported these retaliatory promotions and ongoing racial bias to Department Head Andrew Ryskoski and Supervisor Natasha Alvillar, no investigation occurred. Instead, retaliation intensified.

217.

From October to November 2021, Plaintiff was subjected to frequent and excessive drug testing, which a medical technician admitted was not random. Supervisor Richard Lemoine directed the targeting of Plaintiff, contrary to Exxon's written policies. Ms. Bridget Reed confirmed that Mr. Lemoine was attempting to find a pretext to terminate Plaintiff.

218.

On information and belief, Mr. Lemoine had also publicly posted on Facebook suggesting that African Americans need to be drug tested, demonstrating discriminatory animus and retaliatory intent. No white employees were subjected to similar testing patterns.

219.

Clint Perry and Jacob Bennett, despite serious performance and safety violations, were promoted by Mr. Lemoine. This showed not only favoritism but also retaliatory punishment of Plaintiff for his protected complaints.

220.

In December 2021, Plaintiff documented Mr. Lemoine's discriminatory conduct in a leadership feedback survey, alleging that Mr. Lemoine disciplined and rewarded employees based on race. No action was taken by Supervisor Alvillar in response to this protected activity.

50

221.

On June 6, 2022, Plaintiff suffered a severe spinal injury when he was rear-ended while stopped at a red light. As a result, he was diagnosed with cervical and lumbar disc herniations and was prescribed ongoing treatment, including injections and a recommendation for future corrective surgery.

222.

In March 2023, Mr. Watkins submitted formal medical documentation to Exxon outlining his physical limitations stemming from the accident. His treating physician specified that Mr. Watkins was only capable of performing "light duty" work due to restricted range of motion and lifting capacity. Nevertheless, the core duties of his supervisor position did not involve physical labor, and Mr. Watkins remained capable of fulfilling his role and maintaining his strong performance.

223.

Instead of receiving appropriate accommodations, Mr. Watkins became the target of retaliatory conduct from his supervisor, Richard Lemoine (Caucasian), who had previously admitted to another employee, Kevin Taylor Jr., that he was "biased," had "grown up biased," and that"bias was in his work." Lemoine further stated that although he respected Mr. Watkins's expertise, he preferred to promote Caucasian employees over African Americans.

224.

Following Mr. Watkins's submission of medical documentation, the discriminatory conduct escalated. On or about May 2023, in Mr. Watkins's presence, Lemoine made a racially derogatory remark to a Caucasian contractor, stating: "Just another day at the circus, making monkeys jump through fire." The comment was clearly aimed at Mr. Watkins and others who had

challenged discriminatory practices or required accommodations.

225.

Despite prior recognition by management in 2019 that Mr. Watkins was a strong candidate for the Shift Team Leader position, in September 2023, Exxon promoted Jacob Bennett (Caucasian) to the role. Mr. Bennett had a well-documented history of poor performance, including repeatedly sleeping on duty, and was widely considered one of the lowest-performing employees. Mr. Watkins was told he "needed more time" before he could be promoted, a pretextual explanation inconsistent with his experience, qualifications, and past evaluations.

226.

On November 7, 2023, Plaintiff was asked by Ms. Natasha Alvillar to update his accommodation request with Exxon's medical department. Around the same time, Human Resources Representative Sarah Hayden (Caucasian) admitted in an internal email that the company had the discretion to disregard Mr. Watkins's documented medical restrictions, further evidencing a pattern of retaliation and deliberate indifference toward Plaintiff's rights under Title VII and the ADA.

227.

On or about November 12, 2023, Mr. Watkins was observed with his cell phone on his desk during a shift in which he had no active post responsibilities. Under Exxon's disciplinary guidelines, this type of conduct merited only an "oral reminder." However, on or about November 15, 2023, Exxon deviated from its standard disciplinary protocol and demoted Mr. Watkins from the Supervisor Program to an Assistant Operator position. This demotion occurred despite similar conduct by Caucasian supervisors going unpunished, further highlighting the discriminatory and retaliatory treatment Mr. Watkins faced.

228.

The Assistant Operator role to which Mr. Watkins was demoted was incompatible with his known medical limitations. The job required operating heavy machinery, opening and closing 40-inch steel valves, and climbing 200-foot distillation towers, ladders, scaffolds, and platforms, tasks that Mr. Watkins's physician had previously stated he could not safely perform due to severe spinal injuries.

229.

On or about November 18, 2023, shortly after being forced into this physically demanding position, Mr. Watkins experienced a cardiac problem and was hospitalized. He was diagnosed with cardiomegaly, a serious heart condition, and promptly informed Exxon of his diagnosis.

230.

Despite clear documentation of his disabilities, Exxon continued to disregard Mr. Watkins's medical limitations. On or about November 25, 2023, Mr. Watkins discovered that Exxon had changed his work schedule without notice, risking an unexcused absence that could have been used as pretext for termination. Days later, on or about November 27, 2023, Mr. Watkins alerted five Exxon officials across two departments that he could not work under the conditions imposed on him due to his documented medical restrictions.

231.

On or about December 19, 2023, Mr. Watkins submitted a formal Individual Disability Report (IDR) from a pulmonary and cardiological evaluation to Exxon's Site Occupational Health Manager, Holly Chaney, confirming that he was medically unfit to work until February 2, 2024. While Ms. Chaney acknowledged receipt, she improperly requested an additional "excuse from cardiology," even though one had already been provided.

232.

On or about February 6, 2024, Dr. Fred R. DeFrancesch submitted another IDR to Exxon, citing Plaintiff's spinal injuries and declaring him unfit for any work until at least June 2024. Nonetheless, Exxon's Occupational Health Nurse Practitioner, Greg Grizzafi, falsely claimed that a nurse from Dr. DeFrancesch's office deemed Mr. Watkins fit to work with lifting restrictions, directly contradicting the medical assessment, which explicitly stated that Plaintiff was "unfit for any type of work."

233.

On or about February 8, 2024, Mr. Watkins filed a formal charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging disability discrimination, racial discrimination, and retaliation.

234.

In the weeks following, Exxon personnel continued to mischaracterize Mr. Watkins's medical documentation. On or about February 29, 2024, Occupational Health Nurse Practitioner Emily Arceneaux claimed that the IDR on file cleared Mr. Watkins to return to work by March 13, when in fact, it restricted him from any work until at least June 2024. Mr. Watkins promptly corrected the error in writing.

235.

On March 19, 2024, Exxon's Process Department Head, Cal Ebey, sent a letter demanding yet another IDR by March 26, threatening to terminate Mr. Watkins and cut off his short-term disability benefits if he failed to comply. Mr. Watkins responded on March 25, 2024, submitting a new IDR from pulmonologist Dr. Bogdan Nowakowski, who confirmed that Mr. Watkins was restricted from "excessive physical activity," "dust," and "chemical exposure", all common

conditions in the Assistant Operator role.

236.

Despite receiving multiple IDRs from both his pulmonary and spinal specialists throughout 2024, Exxon continued to ignore Mr. Watkins's limitations. In May 2024, HR Representative Sarah Hayden, who had previously received medical accommodation documentation, led an internal HR investigation into Plaintiff's EEOC complaint in an attempt to discredit his claims, despite being aware of confirmed evidence of discrimination and retaliation.

237.

On June 11, 2024, Ms. Hayden sent Mr. Watkins an email demanding he attend a mandatory in-plant clinic visit by June 14, despite his documented restriction from dust and chemical exposure. Under duress, Mr. Watkins complied on June 13, 2024, and suffered a moderate pulmonary episode due to exposure at the plant, which included a Benzene leak and tank release, as confirmed by a contract security officer. Mr. Watkins struggled to drive out of the facility while suffering breathing distress.

238.

On October 14, 2024, Mr. Watkins was again forced to appear at a mandatory in-plant clinic, in violation of his accommodation restrictions.

239.

On November 4, 2024, Exxon HR Representative Shayla Reed informed Mr. Watkins that a job search would be initiated to locate an accommodation. Exxon's HR policy requires that the search include all national locations, but Ms. Reed later admitted that the search was improperly limited to Baton Rouge, drastically reducing the chance of finding a suitable position.

240.

As a result, on December 11, 2024, Mr. Watkins suffered a constructive discharge. Exxon falsely claimed that it could not locate a position accommodating his disability, despite its own failure to follow proper protocol. Exxon's refusal to provide reasonable accommodation and repeated actions that forced Plaintiff to violate his medical restrictions led directly to his involuntary separation from employment.

241.

Exxon's conduct was not only discriminatory but also retaliatory, as it followed Mr. Watkins's protected activities including requesting accommodations and filing a charge of discrimination.

242.

In addition, Exxon has a documented hostile work environment toward African American employees. Nooses were found at the Baton Rouge facility on five separate occasions between 2016 and 2020. Supervisors like Mr. Leger and Mr. Wesson were promoted despite being reported for racist hate speech, confirming Exxon's tolerance for racial hostility and its pattern of protecting known offenders while retaliating against those who raise concerns.

243.

Mr. Watkins was subjected to retaliation. Mr. Watkins alleges that, through discovery based on these allegations, will prove defendant did in fact engage in intentional retaliation in the terms and conditions of his employment under Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e et seq.

244.

In support of Mr. Watkins's allegation of retaliation under 42 U.S.C. § 1981, Mr. Watkins further alleges:

245.

Plaintiff, Mr. Watkins, is an African American male with a spinal injury and cardiomegaly, placing him in multiple protected categories under federal law.

246.

Throughout his employment, Plaintiff repeatedly reported racially discriminatory conduct and racially hostile treatment to ExxonMobil management, including racially charged remarks, disparate discipline, and denial of equal opportunity.

247.

Despite these protected complaints, ExxonMobil failed to provide Mr. Watkins with a safe and non-discriminatory work environment. Plaintiff alleges that similarly situated Caucasian employees were not subjected to the same unsafe or retaliatory conditions and were, instead, protected and promoted.

248.

Plaintiff served in Exxon's Low Pressure OXO Supervisor Program under the supervision of First Line Supervisor Richard Lemoine (Caucasian), where he consistently faced racial hostility and unequal treatment.

249.

On or about November 2012, First Line Supervisor Chip Leger (Caucasian) referred to Plaintiff and another African American employee as "dogs." Although Supervisor Jason McClanahan (Caucasian) acknowledged the comment as inappropriate, ExxonMobil took no corrective action, failing to address racially derogatory behavior reported by Plaintiff.

250.

In December 2012, Trainer Greg Campagna (Caucasian) made stereotypical and racially

offensive remarks about African Americans, suggesting they were lazy and preferred to "chill in the hood, and drink their 40s." These remarks were part of a racially hostile atmosphere Plaintiff documented and protested.

251.

In Fall 2013, Chip Leger mocked Plaintiff for speaking with African American contract workers wearing orange jumpsuits, implying racial association with criminality by stating, "you seem to be real fond of prisoners huh Jamarsae?" This offensive comment was also not addressed by management despite Plaintiff's objections.

252.

In 2016, when Plaintiff was promoted to Supervisor, his advancement triggered racial resentment among certain white coworkers, which led to retaliatory false accusations and increased scrutiny, designed to undermine his new position and force him out.

253.

That same year, Jeff Hebert (Caucasian) made a racist comment in Plaintiff's presence: "What's the matter Kasey, you not hanging with the N*ggers today?" This and other similar comments were reported and witnessed by African American coworkers but were never disciplined, emboldening further retaliation against Plaintiff.

254.

In 2017, Jeff Hebert continued his offensive conduct, telling a contractor who confused Plaintiff with another African American employee, "Don't worry about it man, they all look alike." Plaintiff reported this pattern of racially hostile behavior but was ignored.

255.

By 2018, despite consistent top performance, Plaintiff was passed over for a promotion to

First Line Supervisor. Supervisor Jarvis Hays had informed Plaintiff that he was next in line for training as a Second Operations Controller, but the opportunity was withheld after Plaintiff's continued complaints.

256.

In Fall 2019, Plaintiff was ranked as the second-best performer out of approximately 30 employees, and in a 2023 evaluation, was praised as "the smartest man in the unit." Nonetheless, his complaints of racial bias and unequal treatment resulted in retaliation, not advancement.

257.

From 2019 to 2021, Plaintiff documented widespread misconduct by white employees sleeping on duty, improper phone use, and safety violations. While Plaintiff and other black employees were disciplined or demoted for minor infractions, these white employees faced no consequences. Plaintiff's reporting of this disparity led to increased targeting by management.

258.

In June 2020, during the George Floyd protests, ExxonMobil supervisors Darian Wesson and Andrew McCain posted racist comments on Facebook calling for the lynching and shooting of Black people. Instead of being disciplined, both were promoted. Plaintiff, who objected to these posts and raised concerns, was later excluded from opportunities and retaliated against.

259.

Following those events, Second Line Supervisor Francis Jackson (Caucasian) called a meeting with six Black employees including Plaintiff and attempted to suppress their complaints by offering overtime and promotions. While some accepted, Plaintiff refused the bribe and continued to voice concerns. Soon after, he was subjected to adverse employment actions.

260.

Between 2020 and 2021, Plaintiff was denied promotions to the Process Mechanical Coordinator Supervisor role and other positions, despite being the top performer. These roles were instead given to underperforming or previously disciplined Caucasian employees, in retaliation for Plaintiff's prior complaints.

261.

Notably, Plaintiff was passed over in favor of individuals including Cody Harrison, Clint Perry, Jacob Bennett, and others, many of whom had serious operational failures or disciplinary histories.

262.

After Plaintiff reported these retaliatory promotions and ongoing racial bias to Department Head Andrew Ryskoski and Supervisor Natasha Alvillar, no investigation occurred. Instead, retaliation intensified.

263.

From October to November 2021, Plaintiff was subjected to frequent and excessive drug testing, which a medical technician named Bridget Reed admitted was not random. Supervisor Richard Lemoine directed the targeting of Plaintiff, contrary to Exxon's written policies. Ms. Bridget Reed confirmed that Mr. Lemoine was attempting to find a pretext to terminate Plaintiff.

264.

On information and belief, Mr. Lemoine had also publicly posted on Facebook suggesting that African Americans need to be drug tested, demonstrating discriminatory animus and retaliatory intent. No white employees were subjected to similar testing patterns.

265.

Clint Perry and Jacob Bennett, despite serious performance and safety violations, were

promoted by Mr. Lemoine. This showed not only favoritism but also retaliatory punishment of Plaintiff for his protected complaints.

266.

In December 2021, Plaintiff documented Mr. Lemoine's discriminatory conduct in a leadership feedback survey, alleging that Mr. Lemoine disciplined and rewarded employees based on race. No action was taken by Supervisor Alvillar nor Department Head Andrew Ryskoski in response to this protected activity.

267.

On June 6, 2022, Plaintiff suffered a severe spinal injury when he was rear-ended while stopped at a red light. As a result, he was diagnosed with cervical and lumbar disc herniations and was prescribed ongoing treatment, including injections and a recommendation for future corrective surgery.

268.

In March 2023, Mr. Watkins submitted formal medical documentation to Exxon outlining his physical limitations stemming from the accident. His treating physician specified that Mr. Watkins was only capable of performing "light duty" work due to restricted range of motion and lifting capacity. Nevertheless, the core duties of his supervisor position did not involve physical labor, and Mr. Watkins remained capable of fulfilling his role and maintaining his strong performance.

269.

Instead of receiving appropriate accommodations, Mr. Watkins became the target of retaliatory conduct from his supervisor, Richard Lemoine (Caucasian), who had previously admitted to another employee, Kevin Taylor Jr., that he was "biased," had "grown up biased," and

61

that "bias was in his work." Lemoine further stated that although he respected Mr. Watkins's expertise, he preferred to promote Caucasian employees over African Americans.

270.

Following Mr. Watkins's submission of medical documentation, the discriminatory conduct escalated. In or about May 2023, in Mr. Watkins's presence, Lemoine made a racially derogatory remark to a Caucasian contractor, stating: "Just another day at the circus, making monkeys jump through fire." The comment was clearly aimed at Mr. Watkins and others who had challenged discriminatory practices or required accommodations.

271.

Despite prior recognition by management in 2019 that Mr. Watkins was a strong candidate for the Shift Team Leader position, in September 2023, Exxon promoted Jacob Bennett (Caucasian) to the role. Mr. Bennett had a well-documented history of poor performance, including repeatedly sleeping on duty, and was widely considered one of the poorest-performing employees. Mr. Watkins was told that he "needed more time" before he could be promoted, a pretextual explanation inconsistent with his experience, qualifications, and past evaluations.

272.

On November 7, 2023, Plaintiff was asked by Ms. Natasha Alvillar to update his accommodation request with Exxon's medical department. Around the same time, Human Resources Representative Sarah Hayden (Caucasian) admitted in an internal email that the company had the discretion to disregard Mr. Watkins's documented medical restrictions, further evidencing a pattern of retaliation and deliberate indifference toward Plaintiff's rights under 42 U.S.C. § 1981.

273.

On or about November 12, 2023, Mr. Watkins was observed with his cell phone on his desk during a shift in which he had no active post responsibilities. Under Exxon's disciplinary guidelines, this type of conduct merited only an "oral reminder." However, on or about November 15, 2023, Exxon deviated from its standard disciplinary protocol and demoted Mr. Watkins from the Supervisor Program to an Assistant Operator position. This demotion occurred despite similar conduct by Caucasian supervisors going unpunished, further highlighting the discriminatory and retaliatory treatment Mr. Watkins faced.

274.

The Assistant Operator role to which Mr. Watkins was demoted was incompatible with his known medical limitations. The job required operating heavy machinery, opening and closing 40-inch steel valves, and climbing 200-foot distillation towers, ladders, scaffolds, and platforms, tasks that Mr. Watkins's physician had previously stated he could not safely perform due to severe spinal injuries.

275.

On or about November 18, 2023, shortly after being forced into this physically demanding position, Mr. Watkins experienced a cardiac problem and was hospitalized. He was diagnosed with cardiomegaly, a serious heart condition, and promptly informed Exxon of his diagnosis.

276.

Despite clear documentation of his disabilities, Exxon continued to disregard Mr. Watkins's medical limitations. On or about November 25, 2023, Mr. Watkins discovered that Exxon had changed his work schedule without notice, risking an unexcused absence that could have been used as pretext for termination. Days later, on or about November 27, 2023, Mr. Watkins alerted five Exxon officials across two departments that he could not work under the conditions

imposed on him due to his documented medical restrictions.

277.

On or about December 19, 2023, Mr. Watkins submitted a formal Individual Disability Report (IDR) from a pulmonary and cardiological evaluation to Exxon's Site Occupational Health Manager, Holly Chaney, confirming that he was medically unfit to work until February 2024. While Ms. Chaney acknowledged receipt, she improperly requested an additional "excuse from cardiology," even though one had already been provided.

278.

On or about February 6, 2024, Dr. Fred R. DeFrancesch submitted another IDR to Exxon, citing Plaintiff's spinal injuries and declaring him unfit for any work until at least June 2024. Nonetheless, Exxon's Occupational Health Nurse Practitioner, Greg Grizzafi, falsely claimed that a nurse from Dr. DeFrancesch's office deemed Mr. Watkins fit to work with lifting restrictions, directly contradicting the medical assessment, which explicitly stated that Plaintiff was "unfit for any type of work."

279.

On or about February 8, 2024, Mr. Watkins filed a formal charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging disability discrimination, racial discrimination, and retaliation.

280.

In the weeks following, Exxon personnel continued to mischaracterize Mr. Watkins's medical documentation. On or about February 29, 2024, Occupational Health Nurse Practitioner Emily Arceneaux claimed that the IDR on file cleared Mr. Watkins to return to work by March 13, when in fact it restricted him from any work until at least June 2024. Mr. Watkins promptly

corrected the error in writing.

281.

On March 19, 2024, Exxon's Process Department Head, Cal Ebey, sent a letter demanding yet another IDR by March 26, threatening to terminate Mr. Watkins and cut off his short-term disability benefits if he failed to comply. Mr. Watkins responded on March 25, 2024, submitting a new IDR from pulmonologist Dr. Bogdan Nowakowski, who confirmed that Mr. Watkins was restricted from "excessive physical activity," "dust," and "chemical exposure", all common conditions in the Assistant Operator role.

282.

Despite receiving multiple IDRs from both his pulmonary and spinal specialists throughout 2024, Exxon continued to ignore Mr. Watkins's limitations. In May 2024, HR Representative Sarah Hayden, who had previously received medical accommodation documentation, led an internal HR investigation into Plaintiff's EEOC complaint in an attempt to discredit his claims, despite being aware of confirmed evidence of discrimination and retaliation.

283.

On June 11, 2024, Ms. Hayden sent Mr. Watkins an email demanding he attend a mandatory in-plant clinic visit by June 14, despite his documented restriction from dust and chemical exposure. Under duress, Mr. Watkins complied and on June 13, 2024, he suffered a moderate pulmonary episode due to exposure at the plant, which included a Benzene leak and tank release, as confirmed by a contract security officer. Mr. Watkins struggled to drive out of the facility while suffering breathing distress.

284.

On October 14, 2024, Mr. Watkins was again forced to appear at a mandatory in-plant

clinic, in violation of his accommodation restrictions.

285.

On November 4, 2024, Exxon HR Representative Shayla Reed informed Mr. Watkins that a job search would be initiated to locate an accommodation. Exxon's HR policy requires that the search include all national locations, but Ms. Reed later admitted that the search was improperly limited to the Baton Rouge area, drastically reducing the chance of finding a suitable position.

286.

As a result, on December 11, 2024, Mr. Watkins suffered a constructive discharge. Exxon falsely claimed that it could not locate a position accommodating his disability, despite its own failure to follow proper protocol. Exxon's refusal to provide reasonable accommodation and repeated actions that forced Plaintiff to violate his medical restrictions led directly to his involuntary separation from employment.

287.

Exxon's conduct was not only discriminatory but also retaliatory, as it followed Mr. Watkins's protected activities including requesting accommodations and filing a charge of discrimination.

288.

In addition, Exxon has a documented hostile work environment toward African American employees. Nooses were found at the Baton Rouge facility on five separate occasions between 2016 and 2020. Supervisors like Mr. Leger and Mr. Wesson were promoted despite being reported for racist hate speech, confirming Exxon's tolerance for racial hostility and its pattern of protecting known offenders while retaliating against those who raise concerns.

289.

Mr. Watkins was subjected to retaliation. Mr. Watkins alleges that, through discovery based on these allegations, will prove defendant did in fact engage in intentional retaliation in the terms and conditions of his employment under 42 U.S.C. § 1981.

## CAUSES OF ACTION

### AS FOR THE FIRST CAUSE OF ACTION AGAINST DEFENDANT FOR A VIOLATION OF
#### Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e *et seq.* (Hostile Work Environment)

290.

Plaintiff Jamarsae Watkins states a cause of action for hostile work environment because of his protected activities against the defendant as he is protected under Title VII of Civil rights act of 1964, as amended and 42 U.S.C. § 2000e et seq. Plaintiff repeats and re-alleges the allegations contained in Paragraph 16, as if fully set forth herein.

291.

Plaintiff Jamarsae Watkins, an African American male with a documented disability (spinal injury and cardiomegaly), is a member of a protected class under Title VII of the Civil Rights Act of 1964.

292.

During his employment with Defendant ExxonMobil, Plaintiff was subjected to a hostile, abusive, and discriminatory work environment that was severe, pervasive, and motivated by racial animus.

293.

Beginning as early as 2012 and continuing through at least 2023, Plaintiff endured repeated racial slurs, derogatory remarks, and discriminatory conduct by supervisors and coworkers. These incidents included being referred to as a "dog" by Supervisor Chip Leger,

being subjected to stereotypes about Black people by Trainer Greg Campagna, and hearing repeated racial epithets such as "n*ggers" and "they all look alike" from coworkers including Jeff Hebert.

294.

Supervisors, including Darian Wesson and Andrew McCain, made or shared violent racist social media posts during the 2020 George Floyd protests, including suggestions that Black individuals should be lynched. Despite the threatening nature of these posts, Exxon took no disciplinary action and instead promoted the individuals responsible.

295.

When Plaintiff and other Black employees reported these incidents, Exxon's management, including Francis Jackson, attempted to suppress complaints by offering promotions and overtime in exchange for silence. Plaintiff refused the offer and was subsequently targeted for retaliation.

296.

Plaintiff was consistently subjected to harsher disciplinary standards than similarly situated white employees. Between 2019 and 2023, he documented over 30 instances of white employees engaging in misconduct without consequence, while Plaintiff and other Black employees were punished for minor or fabricated infractions.

297.

In 2021, Plaintiff was subjected to multiple "random" drug tests that were actually directed by Supervisor Richard Lemoine, who had expressed racial animus and publicly stated that Black employees should be drug tested. A medical technician named Bridget Redd and other Exxon employees confirmed that these tests were targeted and not random.

298.

68

Despite Plaintiff's exceptional performance, ranking as the second-best employee out of 30 employees in 2019 and being referred to as "the smartest man in the unit" in 2023, he was repeatedly denied promotions. Less qualified white employees, including those with disciplinary records or poor work performance, were promoted instead.

299.

Plaintiff's reports of unequal treatment and racial bias to Department Head Andrew Ryskoski, Supervisor Natasha Alvillar, and others were ignored. In December 2021, Plaintiff submitted written leadership feedback outlining that Lemoine made disciplinary decisions based on race; no corrective action was taken.

300.

On or about September 9, 2022, Supervisor Lemoine admitted to another employee that he was "biased," "grew up biased," and had racial preferences in his decision-making at work, including promotion selections. Despite this admission, Exxon allowed him to continue supervising Plaintiff and other black employees.

301.

In May 2023, Lemoine made another racially offensive comment in Plaintiff's presence, describing the workplace as "a circus" where he was "making monkeys jump through fire," invoking historically racist imagery.

302.

In November 2023, Plaintiff was demoted after being seen with his phone on his desk, an act that typically warrants, at most, an oral reminder as per company disciplinary guidelines. White employees were not disciplined for similar or more serious infractions. The demotion to a physically demanding role was particularly punitive given Plaintiff's medical restrictions, which

69

Exxon was fully aware of at the time.

303.

Exxon's conduct created an environment where Plaintiff was persistently humiliated, harassed, denied advancement opportunities, and retaliated against on the basis of his race, in violation of Title VII.

304.

The discriminatory acts and omissions described herein were intentional, willful, and made with reckless disregard for Plaintiff's federally protected rights.

305.

As a result of Defendant's actions, Plaintiff suffered severe emotional distress, reputational harm, career stagnation, financial losses, and exacerbation of medical conditions.

306.

Plaintiff's requests for relief are set forth below.

### AS FOR THE SECOND CAUSE OF ACTION AGAINST DEFENDANT FOR A VIOLATION OF 42 U.S.C. § 1981 (Hostile Work Environment)

307.

Plaintiff, Jamarsae Watkins states a cause of action for hostile work environment because of their protected activities against the defendant as she is protected under 42 U.S.C. § 1981. Plaintiff repeats and re-alleges the allegations contained in Paragraph 55, as if fully set forth herein.

308.

Plaintiff, an African American male, asserts a claim for hostile work environment pursuant to 42 U.S.C. § 1981, which guarantees all persons within the jurisdiction of the United States the

same right to make and enforce contracts as is enjoyed by white citizens, including the right to enjoy the benefits, privileges, terms, and conditions of employment.

309.

Throughout his employment with Defendant Exxon, Plaintiff was subjected to severe, pervasive, and objectively offensive racial harassment and discriminatory conduct that unreasonably interfered with his ability to perform his job and created an intimidating, hostile, and abusive work environment.

310.

Defendant, through its supervisors, managers, and employees, engaged in and permitted a pattern and practice of racially harassing and discriminatory behavior against Plaintiff and other African American employees. This conduct included, but was not limited to:

   a. Derogatory and dehumanizing comments, such as Plaintiff and another Black coworker being referred to as "dogs" by Supervisor Chip Leger, and racial generalizations about Black people being unemployed or on government assistance by Trainer Greg Campagna (2012);

   b. Racial slurs, including a 2016 statement by Jeff Hebert asking, "What's the matter Kasey, you not hanging with the N*ggers today?" and a 2017 comment that "they all look alike";

   c. Racist social media posts by Supervisors Darian Wesson and Andrew McCain in 2020, including statements glorifying lynching and violence against Black people, with no disciplinary action taken by Exxon;

   d. Retaliatory actions following Plaintiff's and other Black employees' objections to racist conduct, including attempts to silence complaints with offers of promotions

and overtime, followed by increased scrutiny and hostility when Plaintiff refused;

e.  Disparate and racially biased application of workplace rules, including Plaintiff being disproportionately selected for drug testing at the direction of Supervisor Richard Lemoine, who stated Black employees should be tested;

f.  Discriminatory discipline, including the failure to discipline white employees for repeated safety violations and misconduct while disciplining Black employees for minor or equivalent infractions;

g.  Denial of promotion opportunities to Plaintiff in favor of less-qualified white employees with disciplinary histories, despite Plaintiff's consistent high performance and prior recommendations for advancement;

h.  Racially offensive comments by supervisors, including Richard Lemoine referring to African American employees as "monkeys" in a "circus";

i.  Lemoine's admission of racial bias, stating to a coworker that he "grew up biased" and preferred promoting white employees, and that this bias influenced his work decisions.

311.

The harassment and discrimination described above were both subjectively and objectively offensive, and they were unwelcome by Plaintiff. The conduct was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

312.

In November 2023, Plaintiff was demoted after being seen with his phone on his desk, an act that typically warrants, at most, an oral reminder as per company disciplinary guidelines. White

employees were not disciplined for similar or more serious infractions. The demotion to a physically demanding role was particularly punitive given Plaintiff's medical restrictions, which Exxon was fully aware of at the time.

313.

Defendant knew or should have known of the racially hostile work environment through complaints made by Plaintiff and others, through supervisor involvement in the conduct, and through internal communications. Nevertheless, Defendant failed to take appropriate remedial action, thereby ratifying and condoning the discriminatory behavior.

314.

The hostile work environment to which Plaintiff was subjected was motivated by his race and deprived him of the enjoyment of all benefits, privileges, terms, and conditions of his employment contract as guaranteed by 42 U.S.C. § 1981.

315.

As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer damages, including emotional distress, mental anguish, loss of dignity, damage to his professional reputation, and economic losses.

316.

Plaintiff's requests for relief are set forth below.

### AS FOR THE THIRD CAUSE OF ACTION AGAINST
### DEFENDANT FOR A VIOLATION OF
### Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e *et seq.*
### (Racial Discrimination)

317.

Plaintiff, Jamarsae Watkins states a cause of action for racial discrimination because of his protected activities against the defendant as she is protected under Title VII

of Civil rights act of 1964, as amended and 42 U.S.C. § 2000e et seq. Plaintiff repeats and re-alleges the allegations contained in Paragraph 92, as if fully set forth herein.

318.

Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against employees on the basis of race with respect to terms, conditions, or privileges of employment. Plaintiff Watkins is an African American male and, thus, a member of a protected class under Title VII.

319.

Throughout his employment with Defendant ExxonMobil, Plaintiff was subjected to pervasive, severe, and continuous racial discrimination in violation of Title VII.

320.

Plaintiff was regularly subjected to racist comments, slurs, and discriminatory behavior by white supervisors and coworkers, including but not limited to being referred to as a "dog," having stereotypes about African Americans repeated in his presence, and being subjected to racially charged remarks comparing Black employees to "prisoners," "monkeys," or asserting "they all look alike."

321.

These statements were made by ExxonMobil employees in supervisory roles or by coworkers whose conduct went unpunished, including Chip Leger, Jeff Hebert, Greg Campagna, Richard Lemoine, and others.

322.

ExxonMobil management was aware of this racially hostile environment and took no meaningful steps to investigate or discipline the offenders. Instead, some of the

individuals who made racist remarks were later promoted.

323.

Plaintiff reported numerous instances of racially motivated harassment and disparate treatment to management, including Department Heads, HR personnel, and direct supervisors, yet no effective corrective action was taken.

324.

Plaintiff was repeatedly denied promotions and professional opportunities that were instead awarded to less qualified white employees, despite clear evidence of Plaintiff's superior performance, documented rankings, and internal acknowledgments of his qualifications and leadership potential.

325.

From 2019 through 2023, Plaintiff observed a consistent pattern of white employees receiving leniency for safety violations, misconduct, and poor performance, while Plaintiff and other African American employees were disciplined, demoted, or scrutinized for minor or fabricated infractions.

326.

In one instance, white supervisors Darian Wesson and Andrew McCain posted violent, racist comments on Facebook advocating for lynching and violence against Black individuals. Rather than being disciplined, both were promoted by ExxonMobil.

327.

Plaintiff was subjected to excessive and targeted drug testing, which a medical technician confirmed was directed by Supervisor Richard Lemoine, who later admitted to having racial biases that influenced his supervisory decisions.

328.

In November 2023, Plaintiff was demoted from a supervisory role to the physically demanding Assistant Operator position for alleged misconduct that, under company policy, warranted at most an oral reminder under company disciplinary guidelines. Similar misconduct by white employees was ignored or excused.

329.

This demotion was inconsistent with Plaintiff's documented medical restrictions, and ExxonMobil refused to provide accommodations that had been made available to similarly situated Caucasian employees.

330.

ExxonMobil has a documented history of racial animus in its Baton Rouge facility, including five separate noose incidents between 2016 and 2020, which the company failed to investigate or address meaningfully.

331.

Plaintiff has identified multiple white employees such as Jim Hall and Cody Harrison who were given job accommodations, light duty, or special assignments tailored to their medical conditions, while African American employees with similar or more severe conditions, including Plaintiff, were denied the same opportunities.

332.

Due to Plaintiff not being provided with any job accommodations, Plaintiff suffered a constructive discharge on December 11, 2024. Defendant claimed they could not find a separate job for him that would accommodate his disability. HR representative Ms. Reed admitted that the job search was conducted specifically in the Baton Rouge area and not

nationally as is proper protocol.

333.

ExxonMobil's conduct demonstrates a pattern and practice of racial discrimination in violation of Title VII, including the creation of a hostile work environment, disparate treatment in promotions and discipline, and discriminatory denial of accommodations.

334.

As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer lost wages, loss of earning capacity, emotional distress, mental anguish, humiliation, reputational harm, and other damages in an amount to be proven at trial.

335.

Defendant's conduct was willful, malicious, and done with reckless disregard for Plaintiff's federally protected rights, entitling Plaintiff to compensatory and punitive damages under Title VII.

336.

Plaintiff's requests for relief are set forth below.

**AS FOR THE FOURTH CAUSE OF ACTION AGAINST
DEFENDANT FOR A VIOLATION OF
42 U.S.C. § 1981
(Racial Discrimination)**

337.

Plaintiff, Jamarsae Watkins states a cause of action for racial discrimination because of his protected activities against the defendant as she is protected under 42 U.S.C. § 1981. Plaintiff repeats and re-alleges the allegations contained in Paragraph 137, as if fully set forth herein.

77

338.

42 U.S.C. § 1981 guarantees all persons within the jurisdiction of the United States the same right to make and enforce contracts as is enjoyed by white citizens, including the right to the full and equal benefit of all laws and proceedings for the security of persons and property.

339.

Plaintiff, an African American male, is a member of a racial minority protected under 42 U.S.C. § 1981.

340.

Plaintiff had a contractual employment relationship with Defendant ExxonMobil, which is subject to the requirements of § 1981.

341.

Throughout his employment, Plaintiff was subjected to intentional and persistent racial discrimination, harassment, and retaliation by ExxonMobil and its agents, supervisors, and employees on the basis of his race.

342.

The discriminatory treatment included, but was not limited to:

a. Repeated exposure to racist slurs and demeaning comments by white supervisors and coworkers;

b. Systemic denial of promotions and career advancement despite Plaintiff's superior qualifications and documented performance;

c. Excessive and pretextual disciplinary scrutiny;

d. Unjustified drug testing targeting African American employees;

e. Denial of workplace accommodations afforded to similarly situated white

employees;

    f.  Constructive demotion and reassignment to physically demanding duties contrary to medical restrictions;

    g.  Constructive discharge through deliberate failure to accommodate and reinstate Plaintiff.

343.

Despite repeated internal complaints, ExxonMobil failed to take remedial or corrective action, and instead promoted individuals known to have engaged in racially hostile conduct. In some instances, management attempted to suppress complaints of racism through coercion, retaliation, and bribery.

344.

Plaintiff was treated less favorably than similarly situated white employees in the terms and conditions of his employment, including disciplinary decisions, job assignments, supervisory evaluations, and promotion opportunities.

345.

ExxonMobil's actions, including its refusal to investigate complaints, its pattern of promoting white employees despite poor performance or misconduct, and its tolerance of racial slurs and symbols such as nooses at the facility, reflect an intent to discriminate on the basis of race.

346.

The racially hostile work environment and adverse employment actions interfered with Plaintiff's ability to perform his job, undermined the integrity of his contractual employment relationship, and denied him the same right to make and enforce contracts as white employees.

Defendant's conduct was deliberate, malicious, and carried out with reckless indifference to Plaintiff's federally protected rights.

347.

As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered damages including lost income and benefits, emotional distress, reputational harm, and other consequential and compensatory damages.

348.

Plaintiff seeks all available relief under 42 U.S.C. § 1981, including compensatory and punitive damages, injunctive relief, attorneys' fees, and such other relief as the Court may deem just and proper.

349.

Plaintiff's requests for relief are set forth below.

### AS FOR THE FIFTH CAUSE OF ACTION AGAINST DEFENDANT FOR A VIOLATION OF Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (Disability Discrimination)

350.

Plaintiff, Mr. Watkins states a cause of action for disability discrimination because of his protected activities against the defendant as he is protected under the Americans with Disabilities Act of 1990. Plaintiff repeats and re-alleges the allegations contained in Paragraph 182, as if fully set forth herein.

351.

The Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., prohibits discrimination against a qualified individual with a disability in all aspects of employment, including hiring, promotions, discipline, job assignments, and termination.

352.

At all relevant times, Plaintiff was employed by Defendant ExxonMobil and was a qualified individual with a disability within the meaning of the ADA. Plaintiff suffers from spinal injuries, including cervical and lumbar disc herniations, as well as cardiomegaly, conditions that substantially limit one or more major life activities, including lifting, standing, and physical exertion.

353.

Plaintiff was capable of performing the essential functions of his Supervisor job with or without reasonable accommodation. His role did not require heavy manual labor or physically strenuous tasks, and he remained qualified for his supervisory position throughout his employment.

354.

Despite being aware of Plaintiff's medical conditions and receiving formal documentation from his treating physicians, ExxonMobil failed to provide reasonable accommodations when they subjected Plaintiff to adverse employment actions on the basis of his disabilities.

355.

In March 2023, Plaintiff submitted updated medical documentation requesting light-duty accommodations. ExxonMobil acknowledged receipt of these records, yet in November 2023, Plaintiff was demoted to the physically demanding position of Assistant Operator which required activities expressly restricted by his physician, including climbing towers and lifting heavy equipment.

356.

ExxonMobil's demotion of Plaintiff placed him in direct conflict with his medical

limitations, exposing him to a significant risk of injury and constituting a failure to accommodate under the ADA.

357.

After notifying Exxon of his subsequent diagnosis of cardiomegaly in November 2023, Plaintiff was subjected to additional discriminatory conduct, including sudden, undisclosed schedule changes that jeopardized his attendance record and could be used as a pretext for further discipline.

358.

Plaintiff repeatedly informed Exxon he was unable to perform the physical demands of the Assistant Operator role. On December 19, 2023, Plaintiff submitted an Individual Disability Report (IDR) from his physician confirming he was unfit to work until at least February 2024. Nevertheless, Exxon disregarded this report and falsely represented that Plaintiff had been cleared to return to work.

359.

In February 2024, Exxon's medical staff further misrepresented Plaintiff's work capacity by falsely claiming that his doctor had authorized limited-duty work, contrary to a signed statement extending Plaintiff's total work restriction through June 2024.

360.

On June 11, 2024, Exxon compelled Plaintiff to attend a mandatory clinic visit at a site with known chemical exposure, despite a formal accommodation request barring exposure to dust and chemicals. As a result, Plaintiff suffered a moderate pulmonary episode triggered by benzene exposure.

361.

Exxon repeated this conduct in October 2024, again requiring Plaintiff to report to the contaminated site, thereby knowingly endangering his health and further violating the ADA. Although Exxon claimed it would conduct a job search to place Plaintiff in a suitable role consistent with his restrictions, the search was limited in geographic scope, contrary to Exxon's own nationwide search protocols. By December 2024, Exxon claimed no positions were available, effectively forcing Plaintiff's resignation.

362.

Plaintiff's forced resignation amounted to a constructive discharge caused by Exxon's ongoing failure to accommodate his disabilities and its refusal to identify a suitable position within the company.

363.

ExxonMobil's conduct reflects a pattern and practice of denying accommodations to African American employees with disabilities while granting accommodations and even promotions to similarly situated white employees. For example, Exxon created a tailored "Improve Coordinator" position for a white employee with a neck injury and promoted another white employee undergoing cancer treatment. In contrast, similarly situated African American employees with documented medical conditions were forced to continue manual labor without accommodation.

364.

Defendant's actions constitute unlawful discrimination in violation of the ADA, including but not limited to:

    a.  Failure to provide reasonable accommodations;

    b.  Assignment of incompatible duties;

c.   Retaliatory demotion;

d.   Constructive discharge;

e.   Disparate treatment in the application of accommodations based on race and disability.

### 365.

As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered damages including lost wages, benefits, emotional distress, mental anguish, pain and suffering, and other compensatory damages.

### 366.

Defendant's conduct was willful, malicious, and carried out in reckless disregard for Plaintiff's federally protected rights, entitling him to compensatory and punitive damages under the ADA.

### 367.

Plaintiff's requests for relief are set forth below.

**AS FOR THE SIXTH CAUSE OF ACTION AGAINST**
**DEFENDANT FOR A VIOLATION OF**
**Title VII of the Civil rights Act of 1964, as amended and 42 U.S.C. § 2000e *et seq.***
**(Retaliation)**

### 368.

Plaintiff states a cause of action for retaliation because of his protected activities against the defendant as he is protected under Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e *et seq*. Plaintiff repeats and re-alleges the allegations contained in Paragraph 200, as if fully set forth herein.

### 369.

Title VII of the Civil Rights Act of 1964, as amended, prohibits an employer from

retaliating against an employee for engaging in protected activity, including reporting or opposing

workplace discrimination based on race or participating in a related investigation or proceeding.

370.

Plaintiff is an African American male who engaged in multiple protected activities under

Title VII during his employment at ExxonMobil, including reporting repeated acts of racial

discrimination, racially hostile remarks, and unequal treatment in promotion, discipline, and job

assignments.

371.

Beginning as early as 2012 and continuing throughout his tenure, Plaintiff reported racially

derogatory statements made by white supervisors and trainers, including being referred to as a

"dog," offensive stereotyping of African Americans, and demeaning comparisons to prisoners and

monkeys. These complaints constituted protected activity under Title VII.

372.

In response to his complaints, Plaintiff faced escalating retaliation, including increased

scrutiny, pretextual discipline, denial of advancement, exclusion from opportunities, and

ultimately, a demotion inconsistent with his qualifications and known medical restrictions.

373.

Despite receiving high performance rankings, multiple internal recognitions of excellence,

and clear eligibility for promotions, Plaintiff was repeatedly passed over in favor of less qualified

white employees, many of whom had disciplinary records or performance issues. These decisions

followed Plaintiff's protected activity and constitute adverse employment actions under Title VII.

374.

Supervisors at ExxonMobil, including Richard Lemoine and Francis Jackson, engaged in

actions intended to suppress Plaintiff's complaints, including offering bribes in the form of overtime or advancement, increasing surveillance, and orchestrating frequent drug testing in violation of company policy.

375.

Plaintiff's supervisor, Mr. Lemoine, who directed this testing and retaliatory conduct, admitted to racial bias in the workplace and expressed a preference for promoting Caucasian employees over African Americans.

376.

In November 2023, Plaintiff was demoted from his supervisory role to a physically strenuous Assistant Operator position. This demotion was retaliatory and occurred in close temporal proximity to Plaintiff's updated request for accommodation and continuing complaints of discrimination.

377.

Following this demotion, Plaintiff experienced a cardiac episode, was diagnosed with cardiomegaly, and submitted additional medical documentation confirming his inability to perform the reassigned duties. Exxon not only failed to accommodate these limitations but actively misrepresented Plaintiff's medical status to force his continued exposure to unsafe work conditions.

378.

Plaintiff filed a formal Charge of Discrimination with the EEOC on February 8, 2024, alleging race and disability discrimination and retaliation. In direct response, Exxon launched an internal investigation not aimed at resolving Plaintiff's complaints but instead discrediting him.

379.

Exxon continued to ignore or falsify medical restrictions, compel Plaintiff to attend hazardous clinic visits at contaminated facilities, and delayed or sabotaged the job search process required under its own accommodation policies. This series of actions culminated in Plaintiff's constructive discharge on or about December 11, 2024.

380.

ExxonMobil's actions were causally connected to Plaintiff's protected activity and constitute unlawful retaliation under Title VII.

381.

As a direct and proximate result of ExxonMobil's retaliatory conduct, Plaintiff has suffered and continues to suffer damages, including lost wages and benefits, emotional distress, mental anguish, reputational harm, and other economic and non-economic damages.

382.

Defendant's conduct was willful, wanton, malicious, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to compensatory and punitive damages under Title VII.

383.

Plaintiff's requests for relief are set forth below.

### AS FOR THE SEVENTH CAUSE OF ACTION AGAINST DEFENDANT FOR A VIOLATION OF 42 U.S.C. § 1981 (Retaliation)

384.

Plaintiff states a cause of action for retaliation because of his protected activities against the defendant as he is protected under 42 U.S.C. § 1981. Plaintiff repeats and re-alleges the allegations contained in Paragraph 246, as if fully set forth herein.

385.

42 U.S.C. § 1981 guarantees all persons within the United States the same right to make and enforce contracts, including the enjoyment of all benefits, privileges, terms, and conditions of the contractual employment relationship, as is enjoyed by white citizens. This statute also prohibits retaliation against individuals who oppose racial discrimination in the workplace.

386.

Plaintiff, an African American male, repeatedly engaged in protected activity by reporting and opposing racially discriminatory treatment throughout his employment with ExxonMobil. These protected activities included internal complaints about racially charged remarks, unequal treatment in discipline and promotion, racially hostile conduct by supervisors, and disparate enforcement of policies.

387.

Beginning in 2012 and continuing through 2024, Plaintiff consistently raised concerns about racial bias, including being subjected to or witnessing racist remarks, stereotypical assumptions about African Americans, favoritism toward white employees, and race-based disparities in promotions and job opportunities.

388.

Rather than remedy the discrimination, ExxonMobil retaliated against Plaintiff through a series of adverse employment actions. These included: unjustified increased scrutiny, exclusion from advancement, denial of promotions for which Plaintiff was qualified, pretextual and excessive drug testing, demotion to a physically demanding role inconsistent with Plaintiff's medical restrictions, and, ultimately, a constructive discharge.

389.

Key management personnel such as First Line Supervisor Richard Lemoine and Second

Line Supervisor Francis Jackson exhibited retaliatory intent, with Lemoine openly admitting racial bias and taking steps to target Plaintiff after he refused to remain silent. For example, Plaintiff was demoted from his supervisory role just days after renewing his complaints and updating his medical accommodation request in November 2023.

390.

Despite having previously been ranked as one of the top performers in his program and praised by supervisors, Plaintiff was consistently passed over for promotions in favor of less qualified white employees with documented performance issues and disciplinary histories. These repeated denials occurred in close temporal proximity to Plaintiff's protected complaints.

391.

ExxonMobil further retaliated against Plaintiff by manipulating his work schedule without notice, misrepresenting medical documentation to force his presence in hazardous work environments, and improperly limiting the job search process for accommodation to the Baton Rouge area, contrary to Exxon's internal policy requiring a nationwide effort.

392.

ExxonMobil's adverse actions including the November 2023 demotion, the repeated violation of Plaintiff's medical accommodations, the compelled exposure to harmful environmental conditions, and the December 2024 constructive discharge were causally connected to Plaintiff's protected activities under § 1981.

393.

As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered and continues to suffer economic losses, including lost wages and benefits, reputational damage, emotional distress, mental anguish, and pain and suffering.

394.

Defendant's conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's federally protected rights under 42 U.S.C. § 1981, entitling Plaintiff to an award of compensatory and punitive damages.

395.

Plaintiff's requests for relief are set forth below.

## ADMINISTRATIVE PROCEDURES

1.

On or about February 8, 2024, Plaintiff Mr. Watkins filed a timely Charge of Discrimination against Exxon Mobil Corporation, alleging discrimination with the Equal Employment Opportunity Commission ("EEOC"). (A true and accurate copy of EEOC Charge of Discrimination # 461-2024-01333, is attached hereto as "Exhibit A")

2.

The Plaintiff has satisfied all statutory prerequisites for filing this action.

3.

On or about March 7, 2025, the EEOC issued a "Determination and Notice Of Rights" letter for Mr. Watkins's Charge of Discrimination. On or about March 7, 2025, Mr. Watkins received this letter. (A true and accurate copy of the EEOC "Determination and Notice of Rights" letter for EEOC Charge of Discrimination # 461-2024-01333, is attached hereto as "Exhibit B".

4.

To remedy the violations of the Plaintiff, the Plaintiff requests that the Court award him the relief prayed for below.

## PRAYER FOR RELIEF

**WHEREFORE**, Jamarsae Watkins prays for the following relief:

1.

That the practices of Defendant complained of herein be determined and adjudged to be in violation of the rights of Mr. Watkins under Title VII,  42 U.S.C. § 1981, and Louisiana Revised Statute §23:631-632, and  any other cause(s) of action that can be inferred from the facts set forth herein;

2.

All damages which Mr. Watkins has sustained as a result of Defendant's conduct, including back pay, front pay, liquidated damages, punitive damages, general and special damages for lost compensation and job benefits he would have received but for the Defendant's unlawful and retaliatory conduct;

3.

An award to Plaintiff of pre-judgment interest at the highest available rate, from and after the date of service of the initial complaint in this action on all wages owed from the date such wages were earned and due;

4.

An award representing Defendant's share of FICA, FUTA, state unemployment insurance and any other required employment taxes;

5.

Awarding Mr. Watkins his costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs;

6.

An award to Plaintiff of compensatory and punitive damages against Defendant, including but not limited to damages for physical injury, emotional distress, humiliation, embarrassment, and anguish;

7.

Post-judgment interest, as provided by law; and

8.

Such other and further legal and equitable relief as may be found appropriate and may be deemed just or equitable.

## JURY DEMAND

Mr. Watkins demands a trial by jury of all issues do triable in this action.

Respectfully submitted this 6th day of June 2025.

Respectfully Submitted,

**THE MINIAS LAW FIRM**

*/s/ Karl White*
Karl White (#40991)
Christopher Minias (#36230)
1615 Poydras Street
Suite 900
New Orleans, LA 70112
Phone: (504) 777-7529
Fax: (504) 556-2866
Email:  karl@miniaslaw.com
            chris@miniaslaw.com
*Attorney for the Plaintiff*

## SERVICE INFORMATION

Plaintiff mailed this day, June 6, 2025, by USPS certified mail Notice of Lawsuit and *Request to Waive Service of a Summons*, two copies of the *Waiver of the Service of the Summons Citation and Acceptance of Service* and a stamped self-addressed envelope to Defendant's agent:

Corporation Service Company 450 Laurel Street, 8th Floor, Baton Rouge, LA 70801. Plaintiff also filed with this Court an unsigned summons.

_____*/s/ Karl White*_____
KARL WHITE